### DAYTON BREAD CO. v. MONTANA FLOUR MILLS CO.

### MONTANA FLOUR MILLS CO. v. DAYTON BREAD CO.

Nos. 8927, 8928.

Circuit Court of Appeals, Sixth Circuit.

March 12, 1942.

Virgil Schaeffer, of Dayton, Ohio (Pickrel, Schaeffer & Ebeling, of Dayton, Ohio, on the brief), for Dayton Bread Co.

Clinton S. Courson and Guy H. Wells, both of Dayton, Ohio (Clinton S. Courson, Guy H. Wells, W. B. Turner, and E. H. & W. B. Turner, all of Dayton, Ohio, on the brief), for Montana Flour Mills Co.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

HAMILTON, Circuit Judge.

Appellee in No. 8927 and appellant in No. 8928, Montana Flour Mills Company, instituted this action against appellant in No. 8927, and appellee in No. 8928, the Dayton Bread Company, to recover liquidated damages for the breach of a contract of sale of 5,000 barrels of flour. The Dayton Bread Company admits the execution of the contract, but insists that it is void under Sections 13069 and 13070, inclusive, of the Ohio Statutes (Gen.Code).

At the conclusion of the evidence, the court peremptorily instructed the jury to find for the Montana Flour Mills Company in the sum of $7,276.67 and disallowed $1,-000 of its claim.

Appellant in No. 8927, the Dayton Bread Company, appeals from the judgment entered against it on the verdict and the appellant in No. 8928, Montana Flour Mills Company, appeals from the ruling of the court in disallowing $1,000 of its claim. The parties agreed to remit $680 of the judgment against the Dayton Bread Company so that the net judgment from which it appeals is $6,596.67.

The Dayton Bread Company is an Ohio corporation engaged in the business of manufacturing, buying, selling and dealing in bakery goods and similar merchandise of all kinds and also in the business of selling flour to other bakers. The Montana Flour Mills Company is a Montana corporation and is engaged in the business of manufacturing, buying, selling and generally dealing in flour and other articles manufactured from grain or cereal and also operates mills, elevators and warehouses, and carries on a general milling and manufacturing business. At the time the contract in controversy was entered into, it operated several mills in the State of Montana and one in the State of Ohio and employed salesmen to call on the trade and sell its products. One of its trade brands was known as "Sapphire Flour."

Before the present contract was entered into, one of its salesmen solicited and received from the Dayton Bread Company an order for 250 barrels of "Sapphire Flour," the sales contract of which was on a standard form used by millers generally and this contract was fully consummated.

On October 6, 1932, the same agent of the Montana Company solicited the President and General Manager of the Dayton Bread Company to purchase more flour from the Montana Company, but was advised that at that time the Dayton Company had on storage approximately 3,000 barrels of flour and had contracted for the purchase of approximately 15,900 barrels which would probably meet all of its requirements for about ten months. The discussion about the order was lengthy, the substance of which was that the agent of the Montana Company was urging the President and General Manager of the Dayton Company to give him an order as he was anxious to get one and his Company was expecting it, the President of the Dayton Company advising him that his company was not at that time in the market for any more flour. Finally the agent of the Montana Company insisted on writing up a contract on his Company's standard form for 5,000 barrels of flour with a thirty days' trade acceptance, assuring the President and General Manager of the Dayton Company he would not have to worry about taking any of the flour, but that the agent of the Montana Company would resell it

probably to some small bakers to whom his Company extended credit. After expressing dissatisfaction with the idea and being reassured by the Montana Company's agent of his expert knowledge of the flour market and that the price of wheat was going up and that they would split whatever profit was made on the transaction, the contract was signed by the Dayton Company's President and General Manager. It was dated October 6, 1937, executed and delivered to the Montana Company's agent. Under its terms the seller agreed to sell to the purchaser 5,000 barrels bulk of "Sapphire Wheat Flour" at $6 per barrel, subject to the terms and conditions of said contract, f. o. b. carrier at shipping point, freight charges to be allowed or paid by the seller. The flour was to be manufactured and shipped by the seller to the purchaser on or before June 30, 1938, the end of the crop year, and shipments were to be made upon directions furnished by the purchaser within that period. The contract was subject to confirmation by the seller's sales manager and on October 11, 1937, he confirmed it and the purchaser was so advised. On receipt of the Dayton Company's order, the Montana Company acquired, in the open market and stored in its elevators, an amount of wheat equivalent to the number of barrels of flour purchased.

On April 25, 1938, the Montana Company inquired of the Dayton Company when it proposed to order out the flour purchased under the contract and on receipt of the letter, the Dayton Company requested the Montana Company to have its agent call on the Dayton Company's President so he could advise him about the true facts of the alleged purchase. On May 6, 1938, the Montana Company's sales manager called on the President of the Dayton Company, who at that time told him of the oral contract he had made with the Montana Company's sales agent simultaneously with the execution of the written contract for the purchase of the flour. This was the first notice the Montana Company's officers or agents had, other than its salesman who solicited and obtained the order, that the flour in question was not purchased in good faith and was not to be delivered in any event.

Although the Montana Company requested the Dayton Company to give instructions for its shipment, none of the flour mentioned in the contract was ordered shipped but on June 30, 1938, the Montana Company advised the Dayton Company that the purchase contract would be terminated according to its terms. On July 5, 1938, the Montana Company demanded of the Dayton Company $8,276.67, which it claimed was the liquidated damages provided in the contract in case of its cancellation or failure of the Dayton Company to demand delivery of the flour within the period of the contract.

The Dayton Company insisted that the contract was void and refused to pay any part of the demand. Thereupon this action was instituted.

It is well settled under the laws of Ohio that purchase or sales of commodities of any kind for future delivery are valid, although the seller may not own the commodity at the time the contract is made and will have no other means of performance than by going into the market and making the requisite purchases when the time for delivery arrives. But such a contract, even though valid on its face and without any patent infirmities in it, becomes void if the real intent of the parties thereto be merely to speculate on the rise or fall of prices and the goods are not in fact to be delivered. The rule of the common law of the State has been incorporated into its statutory law and Sections 13069 and 13070 respectively provide:

"§ 13069. * * * Whoever contracts to have or give to himself or another the option to sell or buy at a future time grain or another commodity, or stock of a railroad or other company, or forestalls the market by spreading false rumors to influence the price of commodities therein, or 'corners' the market for any of such commodities or attempts to do so, shall be fined not less than twenty dollars nor more that five hundred dollars or imprisoned in jail not more than six months, or both."

"§ 13070. * * * All contracts made in violation of the next preceding section shall be void, but the provisions of such section shall only apply to contracts where the intent of the parties thereto is that there shall not be a delivery of the commodity sold, but only a payment of differences by the parties losing upon the rise or fall of the market."

The Dayton Bread Company urges on us that the undisputed facts show that the Montana Flour Mills Company's salesman in negotiating the sale of the flour in ques-

tion was acting within the scope of his employment and in the ordinary course of his employer's business, and that his acts were the acts of his principal and that the pretended purchase of the flour by the Dayton Company's President was a clear violation of the foregoing Statutes. It further urges that even if the Montana Company's agent was acting beyond the scope of his real or apparent authority, that the Montana Company accepted the contract of purchase with all of its infirmities, under the doctrine of ratification.

The Montana Flour Mills Company urges on us that its salesman had no authority, express or implied, to enter into a contract in violation of the Ohio Statutes, and that the intention of its agent to gamble, uncommunicated to it and unexpressed in the sales contract which it accepted in good faith, does not affect the validity of the contract.

Under the Ohio Statutes, the intent to speculate must be common to both seller and buyer. It is not sufficient that only one of the parties understands and means the agreement to be a wagering one. Both parties must participate in the illegal intent to render the agreement void. Otis & Hough v. Thompson, 4 Ohio App. 61; Hawke v. Roberts & Hall, 13 Ohio App. 198.

The primary consideration in determining the validity of transactions calling for delivery in the future is the intention of the parties and where there is a suspicion that the transaction in question is only a cover for a wager, the court will carefully scrutinize the circumstances surrounding the execution of the agreement and will disregard the form of the contract, if illegality otherwise appears.

The court is interested in the maintenance of lawful agreements and the destruction of unlawful ones. It will not permit parties to conceal the real nature of the transaction by complying with outward forms of law.

Authority, actual or apparent, to seek purchasers, solicit orders or to conduct negotiations with a view to sale gives no power to enter into an absolute and binding sale, or a contract to sell without obtaining the principal's approval and generally a principal is not responsible for his agent's deceit unless the agent was authorized to deal with his principal's property in such manner that the principal should be bound in good morals and equity by his agent's statements. Taylor v. Wilson, 44 Ohio App. 100, 183 N.E. 451.

It is well-established law that in the absence of express authority to the contrary, a salesman is limited to the soliciting of orders and transmitting them to his principal and that he has no implied authority to bind his principal by an absolute sale or contract. The promises and inducements held out by the Montana Company's agent in procuring the contract in question exceeded his known authority.

It may be conceded that the power of an agent is not only that conferred upon him by his commission but also as to third persons that which he is held out as possessing. The principal is often bound by the acts of his agent in excess of or in abuse of his actual authority, but this is only true between the principal and third persons who, believing and having a right to believe that the agent was acting within and not exceeding his authority, would sustain a loss if the act was not considered that of the principal. This rule of law is for the purpose of preventing fraud, and rests also upon the ground that when one of two innocent persons must suffer from the act of a third person, he shall sustain the loss who has enabled the third person to do the injury. If, however, a third person dealing with an agent knows he is acting under a circumscribed and limited authority and that his act is in excess of or an abuse of the authority actually conferred, then clearly the principal is not bound.

Applying to this case these familiar principles, there can be little doubt that the Montana Company's agent transgressed his instructions and that his apparent authority did not extend to the making of a conditional sale, or one in violation of the statutory laws of Ohio. The Dayton Company was charged with notice of the lack of authority of the Montana Company's salesman as a representative of the Montana Company. He was no more than a soliciting agent, barren of all authority to do more than solicit the purchase of the flour. With knowledge of the salesman's total lack of authority, the Dayton Company cannot be heard to say that it relied upon the oral representations, promises and agreements alleged to have been made by him.

The Dayton Company urges that as a corporation can act only through an agent, the Montana Company must be deemed to have known what its agent knew and it cannot retain the benefit of his acts without accepting the consequences of his knowledge. In other words, the Dayton Company insists that the Montana Company can acquire no greater rights from its agent's acts than if it did the thing itself knowing what its agent knew. First Nat. Bank v. Burns, 88 Ohio St. 434, 103 N.E. 93, 49 L.R.A.,N.S., 764; Maple v. Cincinnati, H. & D. Railroad Company, 40 Ohio St. 313, 48 Am.Rep. 685. This rule would be applicable if the facts showed that the Montana Company acted solely through its salesman in obtaining the contract in question, but the contract provides "This contract is subject to confirmation by the Seller at Cleveland, Ohio."

Because other agents of the Montana Company were required to approve the contract, its salesman was without authority to make any contract and especially one so extraordinary which involved his principal in a gambling venture. Mahler-Wolf Produce Company v. Meyer, 26 Ohio Cir.Ct. R. 165. The rule which the Dayton Company undertakes to apply to the Montana Company does apply to the Dayton Company because its President was its sole agent in the transaction and was clearly authorized to bind it without the concurrent act of any other officer or agent of the Company.

The Dayton Company also urges that if it be conceded that the Montana Company was innocent of any violation of the Statute in question it cannot avail itself of an advantage obtained by the lawlessness of its agent and that when it accepted the benefits of its agent's unauthorized act, it is to be deemed to have ratified all his acts in the procurement of the contract. It is the general rule that acceptance of a benefit flowing from an unauthorized act amounts to an implied ratification of such act, whether the principal intends to ratify or not, but before this rule is applicable, acts of the agent in excess of his authority must be brought home to the principal. He must have been in possession of all the facts and must have acted in the light of such knowledge and if an agent in making a contract in behalf of his principal inserts therein without the latter's knowledge, terms which he was not authorized to include and such conditions

are not essential elements of the contract and are not brought to the notice of the principal, the latter's performance of the contract will not be deemed a ratification of the unauthorized terms.

Here the Dayton Company's President had actual knowledge of the lack of authority of the Montana Company's salesman to make any promises concerning the contract in question. The Dayton Company cannot, therefore, rely upon the apparent or ostensible authority of the Montana Company's salesman; neither can it predicate any defense to the written contract upon its alleged reliance on the oral promises of the salesman that the contract in no event was to be binding upon the Dayton Company. The agents and officers of the Montana Company authorized to consummate the contract with the Dayton Company were innocent parties and the evidence shows that the Montana Company bought the wheat immediately on receipt of the Dayton Company's order and kept it in storage in order to fulfill its obligation under the sales contract and when the price of wheat declined the Montana Company sustained a loss.

The Dayton Company, by reason of the unlawful conduct of its President, caused a loss to fall on the Montana Company in which conduct the latter's authorized agents took no part and they had no notice of the unauthorized and unlawful conduct of its salesman. There was a breach of the conditions of the written contract by the express terms of which the Dayton Company became liable to the Montana Company.

In view of the fact that under the decisions of the Ohio courts interpreting Sections 13069 and 13070 of the Ohio Statutes, the intent to speculate must be common to both seller and buyer before a transaction is within their condemnation and there being no evidence that any authorized agent of the Montana Company had the intent to enter into a gambling or wagering contract with the Dayton Company, the Statutes in question have no application to the case at bar.

The contract in question provided in substance that if terminated through the fault of the purchaser, the purchaser should pay to the seller certain liquidated damages, one item of which was stated to be "plus twenty cents (20¢) per barrel as the cost of selling." In its complaint, the Montana Company sought to recover $8,276.67 which included $1,000 selling expense. It attached

to the complaint a copy of the contract and an itemized statement of the damages due it, one item of which was set up as "cost of reselling 5,000 barrels at 20¢ per bbl., $1,000."

The Montana Company introduced in evidence this exhibit as its proof of damages. The lower court rejected the $1,000 claim on the ground that the cost of reselling was not an item of liquidated damages contained in the contract, but that this item related exclusively to the original cost of selling. The Montana Company, appellant in No. 8928, insists that as the original amount claimed in its complaint included only one item of selling costs which it inadvertently stated in its exhibit as "reselling costs" the court was in error in rejecting the claim.

Rule 8(a), Rules of Civil Procedure, 28 U.S.C.A. following Section 723(c), provides a pleading shall contain a short and plain statement of the claim showing that the pleader is entitled to relief. Rule 10(c) provides that a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes. Rule 8 (f) provides that all pleading shall be construed as to do substantial justice. In carrying out this mandate, the court in the case of Maty v. Grasselli Chemical Co., 303 U.S. 197, 58 S.Ct. 507, 509, 82 L.Ed. 745, said: "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end."

The parties to a contract by stipulation in the contract may fix the damages for a breach thereof and the amount thus determined will be controlling, unless the measure or amount so fixed is unconscionable or is tainted with fraud. The Montana Company in its pleading set out the aggregate amount of damages it claimed under the contract and attached the contract as an exhibit wherein it was set out with particularity the items making up the aggregate sum claimed in the complaint. There was also attached as an exhibit a mathematical calculation of the liquidated damages which followed the contract formula. The aggregate amount claimed in the complaint included a single item of $1,000 cost of selling. The exhibit containing the mathematical calculation of the damages according to the contract formula contained only one item of selling expense and while the expression "reselling" was used, it is clear from the petition that recovery was sought under the terms of the contract. There is no claim by the Dayton Company that the liquidated damages are unconscionable or tainted with fraud, excluding the inducement held out by the Montana Company's salesman, and there is no claim made by the Dayton Company that it took any of the flour mentioned in the sales contract. It, therefore, follows that the Dayton Company became indebted to the Montana Company for the item of selling expenses included in the contract as a part of the liquidated damages. Construing the complaint and the two exhibits as a single statement and reconciling conflicts, it is clear that the Dayton Company was in no way misled by the Montana Company attaching to the phrase "selling cost" the prefix, "re:".

Applying to Rule 8(f) its true concept that pleadings should be construed to do subtantial justice, we are of the opinion that the complaint of the Montana Company correctly stated its claim and the discrepancy between the pleaded sales contract and the itemization of liquidated damages was immaterial and in no way misled the Dayton Company. Cause No. 8927 is affirmed and cause No. 8928 is reversed for further proceedings consistent with this opinion.