O.N. JONAS COMPANY, INC.,
Plaintiff-Appellant,

v.

BADISCHE CORPORATION,
Defendant-Appellee.

No. 81-7500.

United States Court of Appeals,
Eleventh Circuit.

June 9, 1983.

Dudley B. Magruder, Jr., Karl M. Kothe, Rome, Ga., for plaintiff-appellant.

Sommers & Altenbach, A.O. Bracey, III, Ronald E. Barab, Atlanta, Ga., for defendant-appellee.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

## PER CURIAM:

O.N. Jonas Company, Inc. ("Jonas") appeals the decision of the district court directing a verdict in favor of appellee Badische Corporation ("Badische"), after Jonas presented its case on liability. Appellant Jonas is a carpet manufacturer in Dalton, Georgia. Appellee Badische manufactures carpet yarn which is specifically tested and certified to meet performance specifications and carries nationally recognized trademarks. Jonas sought damages for breach of a requirements contract. The key issue at trial was whether such a contract existed between Jonas and Badische. In directing a verdict, the district court ruled that the documentary evidence in the case did not authorize the court to find that the oral contract was taken out of the statute of frauds. The court said:

> I have no problem with what the contract might have been. For the purpose of what is before the Court, I can accept and I do accept every word of testimony that has been offered, Mrs. Jonas, and all the other individuals. What I'm still looking for is what is there in these documents that shows the quantity that was involved. That is—I can accept that there was an oral contract between the two corporations made by their principals for Badische to supply *all the needs* of O.N. Jonas Company, Inc., but where is there in the memorandum anything that shows that that was the contract as to quantity?

Record, Vol. 4 at 232–33 (emphasis added).

Although not employed by Jonas at the time of trial, Bobby H. Morrison had worked for Jonas from September 1977 to April 1979. Morrison testified that prior to his employment with Jonas, he had dealt with Badische and was impressed with the company and its products. In late 1977 or early 1978, Rich Hodsdon, sales representative for Badische, called on Morrison to suggest that Jonas use Badische yarn. Morrison discussed the possibility of Jonas buying yarn from Badische with Mrs. Peggy Jonas, President of Jonas. Conversations then transpired between Mrs. Jonas and representatives of Badische, culminating in a visit by Mrs. Jonas and Morrison to the "Create" Department of the Badische home office and plant. This meeting resulted in an agreement that Badische would sell yarn to Jonas, who would be licensed to use Badische's name in its sales promotion and to use Badische's products pursuant to the Textile Fibers Products Identification Act.

On July 21, 1978, the parties executed a trademarks license agreement for carpet products for a period of one year. This agreement, which was automatically renewable from year to year unless terminated by either party upon ninety days notice, stated that Jonas could use Badische's trademarks and labels, provided Jonas complied with certain manufacturing standards. Concurrent with this agreement, Jonas purchased a substantial quantity of yarn on July 24, 1978. An August 25, 1978 letter from Diffenderffer of Badische to Mrs. Jonas discloses that the parties contemplated subsequent sales from Badische to Jonas.[1]

---

1. August 25, 1978
   Peggy Jonas
   O.N. Jonas Company
   P.O. Box 1128
   Dalton, GA 30720
   Dear Peggy:
   I really feel quite confident that O.N. Jonas Company is going to do quite well in the contract market place. As such I have no hesitancy in supporting you with merchandising assistance dollars for Essex, Cutty Sark and Whaler.
   As we discussed last week I will commit $4,000 toward your architectural kits in 1978. These monies are available on a 50/50 cooperative effort. All support invoices must be submitted to me no later than December 1st, 1978. In addition, all media proofs must be submitted for approval by me prior to final printings.
   If there is anything I might do to assist in your marketing efforts, please do not hesitate to call.

In late 1978 or early 1979, Badische reimbursed Jonas $4,000 toward Jonas's cost of "$9,536.46 for printing costs of Dow Badische logo, yarn-product information, certifications and warranties on the quantities of Cutty Sark, Essex and Whaler [carpets]." Plaintiff's Exhibit 11. Jonas's December 18, 1978 letter requesting the reimbursement concludes: "Jonas is looking forward to a very successful selling year in 1979 with our Dow Badische contract program." Plaintiff's Exhibit 11. Badische's 1979 catalog of "Performance Certified Carpet Lines" made from Badische fabrics also evidences the anticipated continuing relationship between Jonas and Badische. Plaintiff's Exhibit 23. This 50-page catalog describes the available carpets made from Badische's certified yarns and specifies the manufacturers of each carpet. Jonas is included in the list of those manufacturers and the catalog describes the Whaler and the Essex carpets as being manufactured by Jonas.

In late 1978 Jonas, having received additional orders of the carpet made from Badische yarn, placed an additional order with Badische. A disagreement ensued about the method by which Jonas was to pay Badische. In February 1979, Badische learned that Murray Sobel had purchased the majority of the Jonas stock from the deceased Mr. Jonas's estate. Sobel had previously been an owner of the Williams-East Company, which owed an outstanding judgment to Badische. Discussions regarding Jonas's method of payment for the recent order deteriorated. Mrs. Jonas testified that she was informed by Badische that orders would be filled if Sobel or Williams-East satisfied the outstanding judgment. Jonas furnished Badische with a Walter Heller & Company guaranty, an integral part of the agreement between the companies, but the guaranty was rejected by Badische, allegedly because it did not conform with Badische's guaranty requirements. According to the evidence presented by Jonas, the only reasons given by Badische for not selling the yarn were Sobel's failure to satisfy the Williams-East judgment and an alleged technical deficiency in the Heller guaranty form, an issue not reached in the trial because of the directed verdict.

Jonas sued Badische for its failure to sell the trademarked yarn according to their agreement. Badische's defenses included: (1) there was no contract between Jonas and Badische, and (2) if an agreement existed, it was invalid for failure to comply with the statute of frauds. The district court held, in directing a verdict for Badische, that the evidence failed to show that the oral contract was supported by a memorandum with a sufficient quantity term to preclude invalidation under the statute of frauds. The sole issue on appeal to this court is whether Georgia law authorizes the enforcement of this contract, absent a more specific quantity term.

█ The Uniform Commercial Code's Statute of Frauds, upon which the district court relied, requires that there be some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. Off.Code Ga. Ann. sec. 11–2–201 (1982). Jonas and Badische acknowledge that the Georgia Court of Appeals has interpreted this statute to set forth "three definite and invariable requirements" for a writing to be sufficient: (1) it must evidence a contract for the sale of goods, (2) it must be "signed" by the party against whom enforcement is sought, and (3) it must specify a quantity. *Jinright v. Russell*, 123 Ga.App. 706, 182 S.E.2d 328 (1971).

At trial Jonas relied on a memorandum written by Tewksbury of Badische to comply with the statute of frauds. The memorandum summarized the history of negotiations and transactions between Jonas and Badische and included the statement:

Sincerely
/s/Laura
Laura E. Diffenderffer
LED:pab

cc:
Jay Spears
Rich Hodsdon
Ivor Chapman
Plaintiff's Exhibit 10.

A potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guaranty on *our* form. Record, Vol. 4 at 304. We must now consider whether "the yarn" for the carpet program developed by Jonas and Badische sufficiently states a quantity term. In assessing the sufficiency of the memorandum, we are mindful that:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Off.Code Ga.Ann. sec. 11–2–306 (1982). The official comments in the Uniform Commercial Code emphasize that this section mandates "the reading of commercial background and intent" into the language of any agreement. U.C.C. sec. 2–306 official comment 1 (1978). This provision precludes a finding that a contract for requirements is too indefinite, "since the quantity is determined by the actual good faith requirements of the particular party." U.C.C. sec. 2–306 official comment 2 (1978).[2] Professor J.J. White concludes that under this provision:

> A party who seeks to invalidate a requirements contract therefore bears a heavy burden. Certainly the mere existence of an open quantity term does not support invalidation, since indefiniteness is inherent in requirement contracts.

J. White & R. Summers, *Uniform Commercial Code* 122 (1980).

A traditional application of output and requirements contracts in Georgia is dem-

onstrated by the output contract in *Harris v. Hine,* 232 Ga. 183, 205 S.E.2d 847 (1974). Harris had agreed to sell Hine "all the cotton produced" on his 825 acres at fixed prices, depending on quality. The price of cotton rose and Harris decided to sell his cotton for a higher price, elsewhere if necessary. Hine sued, requesting an injunction, to prevent Harris from selling his cotton elsewhere, and specific performance of the contract. The supreme court found that the writing contained a sufficient quantity term to meet the requirement of the statute of frauds. The court noted that in using such a general quantity term the parties were following long-standing custom in the cotton industry. In judging the writing sufficient, the court was further guided by an official comment to the Uniform Commercial Code:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.

*Harris v. Hine,* 232 Ga. at 185, 205 S.E.2d at 849, citing *Jinright v. Russell,* 123 Ga.App. 706, 707, 182 S.E.2d 328, 329. Similar contracts were also deemed valid in *R.L. Kimsey Cotton Co., Inc. v. Ferguson,* 233 Ga. 962, 214 S.E.2d 360 (1975).

The testimony at trial in the present case indicated that Badische's custom was to aid carpet manufacturers in the creation of new products, to establish a continuing buyer for Badische yarn. The Tewksbury memorandum substantiates Jonas's contention that Badische agreed to supply Jonas with the yarn necessary for the new carpet program. The carpet was promoted and sold on the representation that it would be manufactured from Badische yarns with

---

**2.** Official comment 2 continues:

> Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a

reasonably foreseeable figure. Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance.

U.C.C. sec. 2–306 official comment 2.

trademarks. Both parties financed such promotions, further demonstrating their understanding that Badische would be the exclusive supplier of the yarn Jonas needed for this particular program. Thus, the agreement between Badische and Jonas was analogous to an exclusive dealership agreement, one of the most common situations where indefinite quantity term contracts are used. 3 Bender's U.C.C. Service (Matthew Bender & Co.) sec. 4.05 (1982).

Our analysis is based on the particular facts of this case where: (1) the existence of the contract is established by the evidence, (2) the contract falls within the scope of a requirements contract, under Off.Code Ga.Ann. sec. 11–2–306, and (3) the real issue is proof of the existence of the contract, rather than a dispute over quantity or price. No existing Georgia law precisely controls these combined facts. For example, in *Cox Caulking & Insulating Co. v. Brockett Distributing Co.,* 150 Ga.App. 424, 258 S.E.2d 51 (1979), Cox sued Brockett on claim of breach of contract based on an increase in price. The trial court granted summary judgment in favor of Brockett on the ground that the letter designated by Cox as fulfilling the statute of frauds did not contain an adequate quantity term. The letter's only possible reference to quantity was within the sentence: "On January 14, 1977, Brockett Distributing Co. submitted a price of $2.62 per bag for the above project." 150 Ga.App. at 425, 258 S.E.2d at 51. This writing did not provide the trial court with an adequate basis on which to grant relief since it did not indicate what quantity was to be sold at the advised price or indeed how long that price would be in effect. In the present case, there is no apparent dispute over price or quantity. We are instead faced with a question of possible "unjustified withdrawal" of the seller. In policing against this abuse, a trial court may "set quantities and thus fill 'gaps' in the contract." J. White & R. Summers, *Uniform Commercial Code* 123 (1980). In this case, the exact quantity to be supplied by Badische and purchased by Jonas was to be determined by Jonas's good faith requirements. Given the nature of Jonas's manufacturing such a quantity can be determined, if necessary, in the trial court. Thus, this enforcement of this contract is not prevented by an inadequate basis on which to grant relief.

We conclude that in the context of the business dealings between Badische and Jonas, the Tewksbury memorandum suffices to meet the statute of frauds requirement for a signed memorandum evidencing a sale of a specified quantity of goods.

If a function of jurisprudence is to give effect to lawful bargains, so that each party may have the benefit for which he negotiated, then it follows that agreements for the requirements or output of a party should be enforced. Yet courts have struggled hard with this type arrangement, and not infrequently have denied relief on the ground that such a bargain was unenforceable because too indefinite as to quantity or lacking in mutuality. In view of the Code's attitude concerning indefiniteness, it is not unexpected that failure to state a fixed quantity does not of itself destroy the effectiveness of a requirements or output agreement, as judged by Code standards.

3 Bender's U.C.C. Service (Matthew Bender & Co.) sec. 4.05 (1982) (footnote omitted). Because the evidence demonstrates that both parties intended a requirements contract based on Jonas's good faith needs for the trademarked yarns, the indefiniteness of the written quantity term does not invalidate the agreement. The existence of this contract was established by the Tewksbury memorandum, the correspondence between Jonas and Badische, and the trademark licensing agreement, which was to remain in effect subject to cancellation by either party on ninety days notice. Justice would be thwarted by denying enforceability upon the basis of a lack of a specific quantity. The code was enacted to prevent just such an inequitable result.

We accordingly reverse the judgment of the district court directing a verdict in favor of Badische, and remand the case for trial on the merits of the claim.

REVERSED AND REMANDED.