**ORCHARD GROUP, INC., Plaintiff–Appellee/Cross–Appellant,**

v.

**KONICA MEDICAL CORP., Defendant–Appellant/Cross–Appellee.**

Nos. 96–3686, 96–3687.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1997.

Decided Feb. 3, 1998.

Daina B. VanDervort (briefed), Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, Thomas K. Christo (argued and briefed), David B. Chaffin (briefed), Hare & Chaffin, Boston, MA, for Plaintiff–Appellee/Cross–Appellant.

Robin G. Weaver (briefed), Stacy D. Ballin (argued and briefed), Mark P. Gustaferro (briefed), Squire, Sanders & Dempsey, Cleveland, OH, for Defendant–Appellant/Cross–Appellee.

Before: KEITH and SUHRHEINRICH, Circuit Judges; ROSEN, District Judge.*

ROSEN, District Judge.

## OPINION

Defendant Konica Medical Corporation appeals the judgment entered by the District Court in favor of Plaintiff, Orchard Group, Inc., and the denial of its post-trial Motion for Judgment as a Matter of Law. OGI cross-appeals the denial of its Motion for Pre-Judgment Interest. For the following reasons, we REVERSE.

## I. *INTRODUCTION*

This breach of contract/fraudulent misrepresentation action was filed by the Orchard Group Inc. ("OGI") against Konica Medical Corporation ("Konica") on September 3, 1992 in the United States District Court Northern District of Ohio Eastern Division. Following discovery, Konica filed a Motion for Summary Judgment on May 27, 1994. The District Court denied that motion on January 8, 1996, and the case proceeded to trial on February 26, 1996.

On March 6, 1996, the jury returned a general verdict for OGI on the breach of contract claim for $1,000,000 and found for Konica on the fraudulent misrepresentation claim. The damage award was based on expert testimony regarding profit projections for OGI if Konica had supplied it with x-ray film pursuant to the terms of an April 13, 1992 letter from Konica to OGI.

On March 12, 1996, OGI filed a motion for pre-judgment interest. On March 21, 1996, Konica filed a Fed. R. Civ. Pro. 50 motion for judgment as a matter of law. On May 13, 1996, the District Court denied both motions by Margin Entry Order, without a written opinion. The parties now appeal.

## II. *FACTUAL BACKGROUND*

OGI, an Ohio Corporation, was formed by Drs. Norbert Reich and Frank Seidelman and two businessmen, Kim Bernatz and John Detelich, in early 1992. The company was set up as a buying group for the purpose of offering small non-hospital providers of health care (such as chiropractors and podiatrists) a group discount on medical supplies, such as x-ray film. In return for a fee paid to OGI, members of the group would be permitted to purchase film and medical supplies from a supplier at a discount group rate to be negotiated by OGI. OGI contacted

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Konica to negotiate a discount on film and medical supplies.

During March of 1992, Mr. Kim Bernatz of OGI engaged in discussions with Ms. Barbara Hunter, a Konica sales representative or "Territory Manager" for the Cleveland marketplace. The discussions concerned the possibility of Konica agreeing to supply x-ray film at a discount price. On March 31, 1992, Ms. Hunter sent a letter proposing to offer x-ray film at a 40% discount to OGI members with a rebate, based on percent of gross sales, sent directly to OGI. After orally agreeing to the terms of the letter, Mr. Bernatz asked if there was anything he needed to sign. Ms. Hunter said this was not necessary, and that the letter was the agreement. Subsequently, Ms. Hunter had the terms of this letter approved by her boss, Mr. Dunn, the Regional Manager. Hunter advised Bernatz of Dunn's approval.

Bernatz had known Hunter and Dunn prior to these deals. Hunter had made many similar written proposals to Bernatz when he was the Administrative Director of Radiology at Lakewood Hospital. The proposals said nothing to suggest any requirement of further Konica approval of the terms being offered. Konica was aware that Hunter was making such proposals. Neither Hunter nor anyone at Konica ever informed Bernatz that Hunter had limited authority.

In early April 1992, Ms. Hunter put Mr. Bernatz in contact with Robert Weaver, Konica's Regional Manager for the Southwest. Regional managers were two steps removed from the top position in the company and their responsibilities included marketing and sale of Konica film. Mr. Weaver suggested the discount given to OGI be set at 45% to be more competitive. Mr. Weaver then told Ms. Hunter that he had agreed on a 45% discount with Mr. Bernatz. Subsequently, on April 13, 1992, Ms. Hunter personally delivered OGI another letter identical to the earlier letter except that this letter proposed to offer to OGI Konica x-ray film at 45% off list price. The letter offered this discount "in return for a film commitment of 36 months." Bernatz orally accepted the terms in the letter, and Hunter assured Bernatz that no further approval was necessary. Hunter

sent a copy of the letter to Dunn and explained that Weaver changed the discount to 45%. Dunn then told Hunter to "run with it."

In relevant part, the April 13, 1992 letter stated:

Thank you for your continued support of Konica. Listed below are the terms of the agreement that you and I discussed for [OGI].

DISCOUNT: 45% off list price on medical x-ray films

REBATE: To be paid as administrative fee, semi-annually. Percentages are based on net purchases made by members of [OGI].

$ 0—$300,000........ ..... 10%

$300,000—$750,000..... ..... 11%

$750,000—$1,000,000... ..... 13%

$1,000,000—and over.... ..... 14%

AGREEMENT: [Konica] is pleased to offer these terms in return for a film commitment of 36 mos.

EQUIPMENT: [Konica] equipment will be offered at a 25% discount off list price, with 5% administrative fee to [OGI].

PRICING: Per 100 sheet box listed on p. 2

Once again, thank you for your time and consideration.

Thereafter, OGI began to advertise for Sales Representatives. Hunter supplied OGI with free samples of film and packaging kits for their use in signing OGI members to purchase Konica film. Dunn approved the supply of these samples. Hunter knew that OGI was soliciting prospective alliance members. Weaver introduced OGI to Intra-Trade, so it could serve as OGI's distributor on the West Coast. Weaver told IntraTrade that Konica had agreed to give OGI members a 45% discount on x-ray film.

On May 6, 1992, three weeks after Ms. Hunter's April 13 letter, Konica informed OGI it did not and would not approve the

deal, and that it would not enter into any contract. When OGI was unable to find an alternative supplier, it went out of business a few weeks later, and subsequently instituted the instant action.

As indicated, following the close of discovery, Konica moved for summary judgment arguing that the alleged contract with OGI was not a valid "requirements contract" and, because the contract did not have a stated quantity term, it did not comply with the Uniform Commercial Code's Statute of Frauds and was, therefore, not enforceable. The District Court denied this motion. The case proceeded to trial, and after the jury returned a verdict in favor of OGI, Konica moved for judgment as a matter of law, reasserting its requirements contract/Statute of Frauds arguments and also arguing that the Konica representatives lacked the authority to bind the corporation to the alleged contract. This post-judgment motion was also denied, as was OGI's post-judgment motion for pre-judgment interest. The parties now appeal the District Court's denial of these motions.

### III. ISSUES PRESENTED

The parties' appeal and cross-appeal require resolution of the following issues:

1. Whether the representatives of Konica had actual or apparent authority to bind Konica to the contract with OGI?

2. Whether the April 13, 1992 letter from Konica to OGI satisfies the quantity requirement set out in § 2–201 Statute of Frauds of the Uniform Commercial Code, and is an enforceable "requirements contract" under § 2–306 of the Uniform Commercial Code as adopted by Ohio law? and

3. Whether the District Court erred when it denied OGI's motion for pre-judgment interest?

### IV. ANALYSIS

#### A. STANDARD OR REVIEW

As noted, Konica seeks review of both the denial of its motion for summary judgment regarding whether there was a requirements contract and the denial of its motion for judgment as a matter of law regarding whether there was a requirements contract and whether there was apparent authority to bind Konica. This Court recently stated that:

"Reviewing a Rule 50 determination is preferable to reviewing a summary judgment decision because the Rule 50 decision is based on the complete trial record and not the incomplete pretrial record available at summary judgment." Therefore, we hold that in cases where an appellant made a Rule 56 motion for summary judgment that was denied, makes those same arguments in a Rule 50(a) motion at the close of evidence that was also denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after the entry of judgment we will review only the denial of the Rule 50(b) motion.

*K & T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 174 (6th Cir.1996) (citations omitted). As indicated, Konica moved for summary judgment on the same grounds stated in its Motion for Judgment as a Matter of Law. Therefore, we will not review the denial of the summary judgment motion, but rather, will simply review the denial of Konica's Motion for Judgment as a Matter of Law on both the requirements contract and apparent authority issues. *See also, Jarrett v. Epperly,* 896 F.2d 1013, 1016 (6th Cir.1990) ("Where summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed.")

Konica's Motion for Judgment as a Matter of Law presents questions of Ohio contract law, specifically whether the alleged contract was entered into on behalf of Konica by a person with apparent authority to bind the corporation, and whether, as a matter of law the contract is an enforceable requirements contract and, therefore, complies with the Statute of Frauds. The standard of review in these circumstances was also outlined in *K & T Enterprises:*

[W]hen sitting in diversity, we review denial of a Rule 50 motion using the same standards applicable under the law of the forum state ... [Nevertheless,] [w]e hold

that in diversity cases, a state law standard of review is applicable only when a Rule 50 challenge is mounted to the sufficiency of the evidence supporting a jury's findings. No deference is appropriate in diversity cases to a trial court's resolution of legal questions....

To promote clarity in the standards of review applicable to Rule 50 motions we summarize our survey of the different types of cases ... as follows: Legal determinations, whether made in a diversity case or in a federal question case, will always be reviewed *de novo*. Questions of evidence sufficiency will be reviewed as the forum state would review them in diversity cases....

97 F.3d at 176. Nevertheless, when reviewing the legal question *de novo*, the Court must abide by the jury's findings of the underlying facts, provided they have a reasonable evidentiary basis. *See Porter v. Lima Memorial Hospital*, 995 F.2d 629, 635 (6th Cir.1993) (quoting Ohio Civ R. 50(A)(4)).

## B. *KONICA'S AGENTS HAD APPARENT AUTHORITY TO BIND KONICA*

 Konica appeals the District Court's denial of its Motion for Judgment as a Matter of Law on the apparent authority of Konica's agents to bind it to a contract with OGI. Konica contends that OGI's claim to a "contract" relies exclusively on communications between OGI and Konica employees who lacked the authority to bind Konica to the alleged "nationwide" contract. OGI counters that Hunter, Weaver, and/or Dunn were capable of binding Konica pursuant to: (1) express or implied actual authority or (2) apparent authority.

 When deciding a diversity case, a federal court must apply the substantive law of the state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Here, it is undisputed that the law of Ohio applies.

 With respect to the issue of express or implied actual authority, the Ohio Supreme Court has stated:

If a party by his words or conduct, reasonably interpreted, has caused one, assuming to act as agent for such party in the making of a contract, to believe that such one had the necessary authority to make the contract, such party will be bound by the contract ... In such instances, the terms "implied authority" or "actual implied authority" are often used to describe or label what is so treated as the equivalent of authority.

*Miller v. Wick Building Co.*, 154 Ohio St. 93, 98, 93 N.E.2d 467, 471 (1950) (citations omitted). Thus, an agent has actual implied authority "to do 'what is reasonable for him to infer that the principal desires him to do in light of the principal's manifestations and the facts as he knows or should know them at the time he acts.'" *Master Consolidated Corp. v. BancOhio National Bank*, 61 Ohio St.3d 570, 575, 575 N.E.2d 817, 822 (1991) (citations omitted).

In *Master Consolidated, supra*, the Ohio Supreme Court also articulated what the evidence must show to bind the principal based on the agent's apparent authority. To bind a principal on this basis, it must be shown that:

1) the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and

2) the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent: a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts of conduct has clothed the agent with the appearance of the authority and not where the agent's own conduct has created the apparent authority.

575 N.E.2d at 822.

Relying on the rule set out by the Ohio Supreme Court in *Master Consolidated*, in *General Electric Company v. G Siempelkamp GmbH & Company*, 29 F.3d 1095 (6th Cir.1994), this Court concluded that a manag-

er had apparent authority to bind GE to a contract with a German manufacturer. In that case, GE made an offer in a purchase order to Siempelkamp, a German manufacturer, to buy an industrial laminate press. Siempelkamp then submitted a counter-offer in the form of an order confirmation containing different terms than the purchase order. Carbone, the "Manager of Manufacturing Engineering and Facilities" at GE, signed the counter-offer on the "accepted" blank. This same procedure had been followed when GE purchased a press from Siempelkamp one year earlier. Carbone had conducted the earlier deal, as well. Based upon this evidence, the court concluded that GE "certainly held out Carbone as possessing the authority to act as its agent." *Id.* at 1098. The court found particular support for its conclusion in the fact that Carbone led GE's negotiations with Siempelkamp over several years, and GE never expressly informed Siempelkamp that Carbone lacked authority to bind GE. A letter from Siempelkamp to GE pointing out that the terms of the order confirmation constituted the only contract between that parties was also considered persuasive evidence. The court also noted that Carbone continued to act as GE's agent throughout the performance of the contract by continually signing modifications to the contract.

█ In this case, the jury here necessarily determined that Konica was bound to the April 13, 1992 letter, although there is no basis for determining whether the jury found actual, implied authority or apparent authority.[1] It is clear from the record and from this Court's decision in *General Electric, supra,* however, that the most obvious conclusion is that Konica's agents had apparent authority.

The facts in *General Electric* are analogous to the present case in several aspects, the most prominent of which is the fact that Barbara Hunter, Konica's "Territory Manager" for the Cleveland area, had previously concluded similar deals with Kim Bernatz, before Bernatz came to OGI, when he worked for his former company. In the en-

tire history of Hunter's dealings with Bernatz, Konica never indicated that Hunter did not have authority to bind Konica. Similar to the letter sent by Siempelkamp to GE pointing to the confirmation letter as the contract, Bernatz asked Hunter if there was anything he needed to sign to conclude the deal with Konica, and Hunter answered in the negative, indicating that oral acceptance of Konica's proposal letter was enough. It was Konica's procedure that its customers' only source for confirmation of a deal was through Konica representatives such as Hunter. Finally, Hunter sending the April 13 letter changing the 40% discount from the earlier proposal to 45% after Bernatz had negotiated this with Robert Weaver, Konica's Regional Manager, is analogous to the facts in *General Electric* where Carbone continually signed modifications to the contract GE had with Siempelkamp.

Nevertheless, we should note that in a similar case years ago, this Court found that a salesman for a flour company lacked apparent authority to bind the principal to a contract with a bread company. *Dayton Bread Co. v. Montana Flour Mills Co.,* 126 F.2d 257 (6th Cir.1942). In that case, a salesman from Montana Flour solicited the President and General Manager of Dayton to buy more flour from Montana than it had already purchased. After some hesitation by the President of Dayton, the salesmen finally convinced him to purchase 5,000 more barrels of flour. As persuasion, the salesman assured the President that the price of wheat was on the rise, and Montana would not require Dayton to take the 5,000 barrels, but they would resell it later to smaller bakers at a higher price and split the profits. The President agreed and signed a standard contract for the purchase of the barrels. Montana acquired the flour ordered by Dayton and upon attempting to deliver the flour to Dayton, the President refused to take it, explaining the oral agreement he had made with the salesman. This was the first notice the officers of Montana had that the flour had not been purchased in good faith, and that their

---

1. While apparent authority is a legal conclusion, its elements are chiefly factual matters that are for the jury. *See Shaffer v. Maier,* 68 Ohio St.3d 416, 418–19, 627 N.E.2d 986, 988 (1994); *Strat-*

so *v. Song,* 17 Ohio App.3d 39, 477 N.E.2d 1176 (1984); *Agosto v. Leisure World Travel, Inc.,* 36 Ohio App.2d 213, 304 N.E.2d 910 (1973).

salesman had made such an oral agreement with Dayton. The Court ruled that the salesman had not acted within the scope of his authority, and did not have apparent authority to bind Montana to the agreement.

The reasoning for the decision distinguishes *Dayton Bread* from the case at bar. The court's decision in *Dayton Bread* was influenced by an Ohio law forbidding the sale of commodities with intent to merely speculate on the rise or fall of prices, without intending delivery. *Id.* at 259. Applying the law on apparent authority, the court ruled "there can be little doubt that the Montana Company's agent transgressed his instructions and that *his apparent authority did not extend to the making of a conditional sale, or one in violation of the statutory laws of Ohio.*" *Id.* (Emphasis added.)

For obvious reasons, the current case can be distinguished from *Dayton Bread.* The representatives of Konica were in no way executing an agreement forbidden by state law. In *Dayton Bread* it should have been clear to the President of Dayton that a salesman would not be given authority to bind Montana Flour to an agreement for which the officers of the company could be fined and or imprisoned. In the instant action, it was not so irresponsible for Bernatz to have believed Hunter had the authority to bind Konica particularly since he also had negotiated directly with Robert Weaver, a Regional Manager, and the contract he received from Hunter mirrored his agreement with Weaver.

Applying Ohio law to the current case, it is clear to us that Hunter had the apparent authority to bind Konica to a contract with OGI for the sale of film. Hunter's prior dealings with Bernatz in concluding contracts without any further approval is evidence that Konica held Hunter out as having such authority. Konica knew about Hunter's business practices, and at no time gave Bernatz any indication that Hunter did not have the authority to bind Konica. Moreover, combining Bernatz's previous dealings with Hunter's sending him a proposal and later modifying its terms after further negotiations also gave Bernatz good reason to believe that Hunter had the authority to negotiate and bind Konica to such agreements.

## C. THE OGI–KONICA CONTRACT IS NOT A VALID ENFORCEABLE "REQUIREMENTS CONTRACT"

Konica also argues that Barbara Hunter's April 13, 1992 letter to Kim Bernatz cannot be a "requirements contract" because there is nothing in the letter that identifies how a quantity term could be calculated or implied since no estimates are stated and OGI, as a new company experimenting with a new concept and having no established customers, had no prior course of dealings with Konica or any other supplier of x-ray film. OGI counters that the letter is a requirements contract because in it, OGI agrees to rely exclusively on Konica for its x-ray film needs and Konica agrees to supply OGI with whatever x-ray film OGI needs in the good-faith course of its business.

Although the Ohio Supreme Court has ruled on requirements contracts, it has not specifically ruled on the issue of a new business entering into a requirements contract without a stated numeric quantity term included in the contract. When the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from "all relevant data." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995), citing *Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). Relevant data includes state appellate court decisions, supreme court dicta, restatements of law, law review commentaries, and majority rule among other states. *Id.*

The Uniform Commercial Code's Statute of Frauds, UCC § 2–201, codified in Ohio as Ohio Rev.Code § 1302.04, provides that a contract for the sale of goods for the price of $500 or more is not enforceable

unless there is some writing sufficient to indicate that a contract has been made between the parties and signed by the party against who enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon *but the contract is not enforceable under*

*this division beyond the quantity of goods shown in such writing.*

UCC § 2–201(1), Ohio Rev.Code Ann. § 1302.04(A) (emphasis added). Typically, therefore, if a contract lacks a quantity term, it is runs afoul of the Statute of Frauds and is not enforceable. The April 13, 1992 letter from Hunter does not on its face contain any quantity term. However, OGI contends that it is nevertheless an enforceable contract because it is a "requirements contract".

This Court had the opportunity to discuss Ohio requirements contracts in *Cyril Bath Co. v. Winters Industries*, 892 F.2d 465, 467–68 (6th Cir.1989). In that case, we stated:

A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business. UCC 2–306(1), as adopted by Ohio, sets forth the standard for a requirements contract:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, *except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.*

*Cyril Bath*, 892 F.2d at 467 (*emphasis* added).

█ The April 13, 1992 letter from Konica lacks a stated estimate and there is no "normal or otherwise comparable prior output or requirements" because OGI is a new company without prior dealings with Konica or any other film supplier, or with any customers for that matter. Rather, the letter only has a rebate schedule based on the quantity of film purchased by OGI from 0 units to in excess of 1,000,000 units. Therefore, in this context, the letter here on its face fails as a requirements contract because it lacks a specific quantity term—estimate or otherwise—and

there is no prior course of dealings from which a quantity term could be implied. *Cf. Fuchs v. United Motor Stage Co.*, 135 Ohio St. 509, 513, 21 N.E.2d 669, 672 (1939) *with Lima Locomotive & Machine Co. v. National Steel Castings Co.*, 155 F. 77, 79 (6th Cir.1907).[2]

In response to this deficiency, OGI counters that the April 13 letter is exclusive because the letter states that: "[Konica] is pleased to offer these terms in return for a film commitment of 36 mos." OGI argues that, because the alleged agreement is exclusive, the implied UCC term of fair dealing binds OGI to purchase some quantity of film. Here, OGI relies on the UCC § 2–306 Official Comment 2 which provides that the party who will determine quantity is required to conduct business in good faith according to commercial standards of fair dealing in the trade so that his requirements will approximate a reasonably foreseeable figure. *See also*, UCC § 1–203 (implied contract term of good faith).

In support of this argument, OGI directs our attention to two cases which hold that exclusive agreements without quantity terms are enforceable requirements contracts.

In *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1164–65 (11th Cir.1983), the parties, Jonas Company, a carpet manufacturer, and Badische Corporation, a yarn manufacturer, had entered into a trademark license agreement for the use the yarn manufacturer's logo and labels. Concurrent with this agreement, Jonas purchased a substantial quantity of yarn from Badische. A month later, Badische sent a letter to Jonas indicating that the yarn manufacturer contemplated subsequent sales of yarn to Jonas.

A few months later, Jonas placed an additional order for yarn with Badische. A dispute subsequently arose and the carpet manufacturer sued for damages for breach of contract. The district court held in entering a directed verdict in favor of Badische that the evidence failed to show that the oral

---

**2.** OGI suggests that these cases are no longer good law because they pre-date the UCC. However, Ohio's adoption of the UCC states that "unless displaced by the particular provisions of [codification of the UCC], the principles of law

and equity, including ... the law relative to capacity, principal, and agent, ... or other validating or invalidating cause shall supplement their provisions." Ohio. Rev.Code Ann. § 1301.03.

contract was supported by a memorandum with a sufficient quantity term to preclude invalidation under the statute of frauds. On appeal, the Eleventh Circuit found a requirements contract based on a memo that summarized the history of negotiations and transactions between the parties which included the statement: "A potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guaranty on our form." 706 F.2d at 1164. The court reasoned that the evidence demonstrates that both parties intended a requirements contract based on appellant's good faith needs for the trademarked yarns and that the indefiniteness of the written quantity term should not invalidate the agreement. *Id.* at 1165.

The Third Circuit, relying in part on *O.N. Jonas,* has also noted that "exclusive requirements contracts satisfy the quantity requirements of the statute of frauds, albeit no specific amount is stated." *Advent Systems Limited v. Unisys Corporation,* 925 F.2d 670, 678 (3rd Cir.1991). In that case, Advent agreed to provide the software and hardware making up the electronic document management system that Unisys was to sell in the United States and to provide sales, marketing, and technical support. The court found that this was a requirements contract because exclusive supply/need contracts need not have quantity terms since good faith performance itself supplies a sufficient notion of quantity:

> The reasons for excepting exclusive requirements contracts from the strictures of the statute of frauds are strong. The purchasing party, perhaps unable to anticipate its precise needs, nevertheless wishes to have assurances of supply and fixed price. The seller, on the other hand, finds an advantage in having a steady customer. Such arrangements have commercial value. To deny enforceability through a rigid reading of the quantity term in the statute of frauds would run contrary to the basis thrust of the Code—to conform the law to business reality and practices.

*Advent, supra,* 925 F.2d at 678. In so holding, the court found exclusivity because the parties contemplated a continuing relationship that resembled a joint venture or distributorship. *Id.* at 678–79.

Thus, it is critical to OGI's argument that the April 13 letter be found to create an exclusive relationship between it and Konica. Indeed, OGI concedes as much by arguing that non-exclusive requirements contracts require a specific numeric term. *See City of Louisville v. Rockwell Mfg. Co.,* 482 F.2d 159 (6th Cir.1973) (agreement stating that seller would furnish part of the buyer's requirements for parking meters for one year and listing a quantity of approximately 7650 parking meters is a requirements contract); *Cyril Bath, supra,* 892 F.2d 465 (buyer implicitly promised to purchase its requirements from the seller because of the specificity of the number of goods in the contract and the seller's knowledge of the buyer's requirements).

In urging us to find exclusivity, OGI directs our attention to the following phrase in the April 13, 1992 letter: "[Konica] is pleased to offer these terms in return for a film commitment for 36 mos." It is OGI's contention that this phrase reflects the intent of the parties to enter into an exclusive relationship. There is nothing in the language itself on its fact which even remotely suggests exclusivity. (Nor is there any indication, either in the letter or in the evidentiary record of an exclusive relationship or the kind of joint venture or distributorship relationships that the courts considered in *Advent* and *O.N. Jonas.*) But perhaps more conclusively, any optimistic notion of exclusivity here is completely foreclosed by the open-ended nature of this letter—the letter itself indicates that OGI could simply order 0 units from Konica and be in compliance with its terms.

■ No doubt recognizing the problems presented by the language of the letter, OGI attempts to offer parole evidence to counter the force of its plain language. However, parole evidence is only admissible when the contract language is itself ambiguous as to its terms. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 794 (4th Cir. 1989). Here, there is simply no ambiguity. The April 13 letter is not unclear; it simply does not suggest, even impliedly, an exclusive

relationship. To permit parole evidence would be to effectively permit post-litigation revision of a contract which is not the least unclear.

Furthermore, even if we were to allow parole evidence, as noted, there is no record evidence in this case that establishes or suggests exclusivity or that the parties intended, or even contemplated, an exclusive relationship.

Therefore, because the April 13, 1992 letter from Konica to OGI is not exclusive and lacks any identifiable quantity term, or one that may be implied from a prior course of dealings, we hold that it is not a requirements contract as a matter of law.

## V. CONCLUSION

For all of the foregoing reasons, we REVERSE the District Court and enter judgment in favor of Defendant Konica Medical Corporation.[3]

---

3. Because we hold the contract invalid, we need not reach the issue of pre-judgment interest.