**SEA LINK INT'L, INC., Plaintiff,**

v.

**OSRAM SYLVANIA, INC., Defendant.**

**Civil Action No. CV296–94.**

United States District Court,
S.D. Georgia,
Brunswick Division.

March 25, 1997.

Forrest Walker Sweat, Jr., Walker & Sweat, Waycross, GA, Sherman Willis, Patty Gamble, W. Thomas Smith, Gardner, Willis, Sweat & Goldsmith, Albany, GA, for Plaintiff.

Glen M. Darbyshire, Robert Studwick Glenn, Jr., Steven I. Loew, Hunter, Maclean Exley & Dunn, Savannah, GA for Defendant.

### ORDER

ALAIMO, District Judge.

Plaintiff, Sea Link Int'l, Inc. ("Sea Link"), brings this diversity action based upon the common–law and statutory contract laws of Georgia.[1] Currently before the Court is the motion for summary judgment filed by Defendant, Osram Sylvania, Inc. ("Osram"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, OSRAM's motion for summary judgment will be

### FACTS

This case accurately represents the inherent complexity and potential risks of engaging in component parts manufacturing and trade on an international scale in the twentieth century. Involved in this matter are three corporations, two of which dispute the provisions of a "requirements contract" for small, specialized component parts that were manufactured in and shipped from Asia, for ultimate resale in the United States.

The two principal parties involved in this dispute are Sea Link, a corporate supplier of component parts, and Osram, a corporate purchaser of component parts and distributor of assembled products. The third party involved in this dispute is the Camcar Division of Textron, Inc. ("Camcar"), which contracted with Sea Link to purchase custom, component parts for further distribution to Osram, which intended to use the component parts to assemble products for further sale through the consumer "food chain."

In 1990, Sea Link was formed by William Forehand ("Forehand"), and James McFarland ("McFarland"), to purchase various products made in Asia and to sell them for profit within the United States. Sea Link was operated from two separate offices located in Georgia and Florida, which appeared to have difficulty communicating with respect to the company's dealings with other corporations.

In May, 1992, Sea Link was awarded a purchase order contract to supply "jack screws" to Osram.[2] Osram used the jack

---

1. An issue arose in this case concerning whether to apply the laws of New York or Georgia to the facts of this case. The contract entered into between the parties contains a choice of law provision indicating that New York law governs any contractual disputes. Notwithstanding the "New York" choice of law provision, the original briefs filed by both parties were supported only by citations to Georgia law. Therefore, the Court ordered the parties to submit briefs on the issue of whether the choice of law provision required the Court to apply New York law. On March 13, 1997, the parties filed a joint memorandum in which they agreed that the contract should be interpreted according to Georgia law because Georgia has a materially greater interest in the resolution of this dispute. Accordingly, the Court will decide this motion for summary judgment based upon the laws of Georgia.

2. A "purchase order" is a "blanket" contract between two parties that covers numerous shipments of one particular component part. (Def.'s Mot. for Summ. J. at 3.) A purchase order pro-

screws to construct headlight assemblies, which Osram forwarded to Chrysler for use in the S–Body minivan. Sea Link contends that it was required to maintain a blanket inventory of 250,000 jack screws, in addition to maintaining an additional average of 200,000 jack screws for immediate release. (Compl.¶ 7.) The contract between the parties, however, only required Sea Link to maintain a "two month" supply of jack screws in inventory.

In 1994, Sea Link received an order from Camcar for over 200,000 each of three types of specialized brackets, known as "015s, 016s and 018s" ("custom brackets"). (Am. Compl.¶¶ 21–22.) Camcar intended to use those custom brackets to complete a contract that it entered with Osram. (*Id.* ¶ 22.) Sea Link states that it needed ninety days "lead time" to order the custom brackets from Asia for delivery to Sea Link's warehouse.

In 1995, Osram stopped ordering jack screws from Sea Link, leaving Sea Link with a substantial excess inventory of those items. Sea Link, claiming economic losses as a result of the excess inventory, seeks to hold Osram liable for breach of contract. Similarly, Camcar stopped ordering custom brackets from Sea Link. Sea Link now seeks to hold Osram liable for Camcar's refusal to purchase the excess inventory of custom brackets.

### *DISCUSSION*

**I.  *Summary Judgment***

Summary judgment requires Osram to establish the absence of genuine issues of material fact, such that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Lordmann Enterprises, Inc. v. Equicor, Inc.,* 32 F.3d 1529, 1532 (11th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). After Osram meets this burden, "the non–moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 (11th Cir.1994) (citing

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party to a summary judgment motion need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

The court should consider the pleadings, depositions and affidavits in the case before reaching its decision, Fed.R.Civ.P. 56(c), and all reasonable inferences will be made in favor of the non–movant. *Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir.1992). Additionally, a "court need not permit a case to go to a jury … when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible'." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir.1996). Furthermore, when the evidence is only circumstantial, summary judgment may be granted when a court "concludes that no reasonable jury may infer from the assumed facts the conclusions upon which the non–movant's claim rests." *Id.*

**II.  *Jack Screws***

Sea Link contends that Osram improperly failed to notify it of Osram's decision to stop ordering jack screws. Furthermore, Sea Link contends that Osram agreed to purchase all of the jack screws contracted for "immediate release," as well as the blanket inventory stored by Sea Link. (Compl.¶ 8.) Sea Link also contends that it received a purchase order from Osram on February 14, 1995, requesting 578,100 jack screws, over and above the blanket inventory of 250,000. (*Id.* ¶ 9.) Relying on those purchase orders, Sea Link contends that *Osram* is liable for the costs of its excess inventory.

Sea Link asserts that it was not until March 5, 1995, that Osram notified it of its intention to discontinue using jack screws. Sea Link then reportedly requested that Osram purchase the existing inventory of approximately 464,000 jack screws, which Osram refuses to purchase.

vides a forecast of the buyer's estimated annual requirements for that particular component part. (*Id.*) Once a buyer receives the amount originally

forecasted, then that buyer must create a new purchase order for additional amounts, if needed. (*Id.* at 3 n. 4.)

Osram answered Sea Link's Complaint by asserting that it complied fully with the contract between the parties and that Sea Link failed to comply with the notice provisions of the contract. (*See generally* Def.'s Answer Second, Third, and Fourth Defenses.) Moreover, Osram contends that it warned Sea Link at least eight weeks in advance of its decision to stop ordering jack screws and that Sea Link is solely responsible for any costs associated with its careless ordering and resulting excess inventory of jack screws.

Comprehending the parties' contractual procedure is necessary to understand the relationship between Sea Link and Osram. The purchase order contract contained an estimated annual forecast of Osram's need for jack screws. Once Osram had "firm numbers" from Chrysler, Osram issued weekly "release schedules" to Sea Link between eight to twelve weeks in advance of Osram's actual needs. (Def.'s Mot. for Summ. J. at 4.) Osram was obligated to purchase only the "released" quantity that it requested. (*Id.*) Osram was not required to purchase any amount in excess of the number of parts actually shown on the release schedules. (*Id.*) Osram ordered jack screws under this procedure until May 3, 1 995. Furthermore, Osram contends that it warned Sea Link in December, 1994, and February, 1995, of Chrysler's anticipated decline in production of S–Body minivans, thereby placing Sea Link on notice that it should pay particular attention to all release schedules. Therefore, Osram denies any liability for quantities of jack screws beyond those included in the release schedules through May 3, 1995.

Osram asserts that Sea Link mistakenly ordered component parts based upon the purchase order forecasts, and not based upon the release schedules. (*See id.* at 6 (citing Forehand Dep. at 86, 185, 191).) Osram contends, therefore, that Sea Link was careless in ordering jack screws, and inattentive to its internal communications, which misfeasance resulted in excess inventory for which only Sea Link remains liable. The Court agrees with Osram.

## A. Contract

Osram correctly points out that the "foremost principle of contract interpretation" is to read the four corners of the contract. (*Id.* (citing *McCann v. Glynn Lumber Co.* 199 Ga. 669, 34 S.E.2d 839 (1945)).) The purchase order contract is unambiguous in several material respects. First, it lists the parties, the duration of the purchase order, the price, and the product involved. (*Id.* Ex. D.) The contract further states that the "[s]upplier [is] to maintain a two month supply, as per release schedule, on hand for expediting purposes. This blanket order quantity is an estimate of [Osram's] annual requirement and should be considered as only a forecast. [Osram's] *responsibility is limited to the released quantity.*" (*Id.* (emphasis added).)[3] Each purchase order, thus, indicates the exact quantity to be released, for which Osram was liable.[4]

Osram notified Sea Link on several occasions that its need for jack screws would be coming to an end. The evidence produced establishes that Osram, in fact, notified Sea Link as early as February, 1995, of its diminishing needs. In a letter dated February 22, 1995, Osram informed Sea Link that "[t]he S–Body and Bux programs are coming to an end. The 'Build Out' for the S–Body components will be 05/12/95. The 'Build out' for the Bux components will be 07/28/95." (*Id.* Ex H.) The letter continues by clearly identi-

---

**3.** The purchase order contract actually lists the buyer as "GTE." However, it is clear to the Court that the purchase order contract was sent from Sylvania Consumer Lighting, which is a division of GTE Products Corporation. The Court has substituted "Osram" in the relevant contract language, as that is the "short" name for Sylvania that the parties have used in their respective briefs.

**4.** For example, purchase order contract number 06–08040 covered the period from May 19, 1992, through June 30, 1993. On the order date of May 18, 1992, Osram requested a release quantity of 2,500,000 jack screws, which quantity was reduced three days later on May 21, 1993, to 1,250,000 by a subsequent purchase order contract because an error was made in the "quantity estimate." (*See* Def.'s Mot. for Summ. J. Ex. D.) Thus, pursuant to the terms of the contract, Osram was obligated to purchase only the exact "quantity released," or 1,250,000 jack screws.

fying the component part affected by the ending of the programs as the jack screw.[5] As stated by Osram, Sea Link should have been cautious as early as February, 1995, regarding Osram's diminishing needs for the jack screws.[6] Osram continued to purchase jack screws from Sea Link through May, 1995. Thus, Sea Link had approximately two months notice of Osram's diminishing needs for jack screws. Given the unambiguous contract language and the requirement that Sea Link maintain only a two month supply of jack screws, the Court is confused why Sea Link would have ordered so many additional jack screws from its Asian supplier.

The contractual relationship in question seems to have progressed without issue until early 1995, when Osram notified Sea Link of the diminishing need for jack screws. Sea Link, therefore, bases much of its argument that Osram is liable for its excess inventory of jack screws on the final purchase order contract sent by Osram to Sea Link in February, 1995. (*See* Pl.'s Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. D.) Osram does not deny that it ordered jack screws in February, 1995. Osram, however, contends that it did not order any jack screws beyond May, 1995, and is not liable for any purchases past that time.

■ Sea Link further contends that by the time it learned of Osram's diminishing needs for jack screws, it already had ordered huge quantities of jack screws from its Asian supplier and it was simply too late to stop production on those orders. Sea Link asserts that it had to order jack screws ninety days in advance of its needs because it took the Asian supplier that long to manufacture jack screws. However, the purchase order contract does not assign liability to Osram for the risk that Sea Link took in dealing with an overseas manufacturer whose manufacturing process took nearly three months to produce jack screws. It appears, from the evidence presented, that Sea Link simply "over-ordered" jack screws beyond its customer's needs, leaving excess inventory for which Sea Link, not Osram, remains liable.

### B. Requirements Contract

Osram also asserts that the purchase order contract was, in essence, a "requirements" contract, in which Osram was liable to purchase only those quantities of jack screws that it actually required in its production operations. Osram is correct in that assertion.

■ The laws of Georgia recognize "requirements" contracts, but impose certain duties upon the buyers and sellers who are parties to this specific type of contract. *See* Ga.Code Ann. § 11–2–306 (Michie 1994). Both parties to a requirements contract must, under the law, use good faith in their dealings with one another. *Id.* at § 11–2–306(1); *Flynn v. Gold Kist, Inc.*, 181 Ga.App. 637, 353 S.E.2d 537, 539 (1987). While Osram, the buyer, was required to purchase its requirements of jack screws from the seller, Sea Link, Osram was not required to purchase any "quantity unreasonably disproportionate to any stated estimate ... [or] normal or otherwise comparable prior output or requirements.. tendered or demanded." *Id.* As noted by the Eleventh Circuit, "[r]easonable elasticity in the requirements is expressly envisaged by [section 11–2–306] and good faith variations from prior requirements are permitted even when the variation *may be such as to result in discontinuance.*" *O.N. Jonas Co., Inc. v. Badische Corp.* 706 F.2d 1161, 1164 (11th Cir.1983) (emphasis added)

---

5. The letter lists the parts affected by part number, not by name. The part number reflected in the letter is the same part number as that listed in the purchase order contracts for the jack screw. The letter, therefore, unambiguously refers to the jack screw as the part affected by the ending of the programs.

6. It appears that Sea Link must have become somewhat cautious concerning Osram's notification, since Sea Link's Asian supplier, Ekpac Trading Ltd. ("Ekpac"), sent Sea Link an alarming telefax on February 21, 1995, the same date of Osram's notification to Sea Link, in which Ekpac claimed to be "shocked" by Sea Link's apparent request that Ekpac "stop production" of the jack screws. Although the telefax from Ekpac to Sea Link is written in broken English, it is evident that Ekpac received orders from Sea Link for large quantities of jack screws prior to Sea Link's request that Ekpac stop production of the jack screws. In its telefax, Ekpac stated its intention to require payment from Sea Link for those orders. (*See id.* Ex. 1.)

(interpreting Ga.Code Ann. § 11–2–306 and citing the Official Comment to U.C.C. § 2–306).

■ Thus, a requirements contract necessarily involves risk to the supplier that the buyer will, at some point, not "require" any more component parts. Sea Link based much of its ordering on the "forecasted" amounts, rather than on the "released quantity," as required by the clear terms of the purchase order contract. Sea Link greatly over-ordered jack screws, even compared with the forecasted amounts upon which it based its orders to its Asian supplier. (*See* Def.'s Mot. for Summ. J. at 14 n. 12 (explaining that even if Sea Link based its orders on the forecasted amounts, which practice contradicted the express terms of the contract, it ordered nearly double the amount forecasted).) Osram properly notified Sea Link of the "build–out" of the vehicle programs for which Osram supplied component parts. In fact, Osram even identified the jack screw as the part that would be affected by the forthcoming build–out, thereby notifying Sea Link that Osram would be discontinuing its requirements for jack screws. Putting aside for a moment Sea Link's failure to comply with the express provisions of the contract, under the laws of Georgia regarding requirements contracts, Osram's arguments also leave no genuine issues of material facts. Osram complied, in good faith, with its obligations under the requirements contract and cannot be held liable for Sea Link's errors. Accordingly, Osram's motion for summary judgment with respect to Sea Link's breach of contract claim regarding the "jack screw" contract will be granted.

## C. Waiver

Osram also contends that Sea Link waived its right to a breach of contract claim, as well as its right to request an equitable adjustment because Sea Link failed to comply with the notice provisions of the contract. (*Id.* at 16.) The "reverse side" of the purchase order contract requires Sea Link to request, in writing, an adjustment if any dispute arises concerning the cost of or time required for performance of the purchase order contract. (*Id.* Ex. F ¶ 10.)

Sea Link, in fact, did send Osram a written notice asking Osram for clarification on how to handle the excess inventory of jack screws. *See* Letter from Jim McFarland, Sea Link, to Shannon Rehm, Osram (Feb. 27, 1995). While that letter requests "advice" from Osram on how to handle the problem, the letter never requests any adjustment concerning the cost of, or time for, performance of the purchase order contract.

■ Construing the letter in the light most favorable to Sea Link, the Court finds that the letter does not constitute a waiver of a claim for breach of contract. Although Sea Link's breach of contract claim is well–pled, it simply is without merit due to Sea Link's own purchasing errors. The letter requests "advice" from Osram, which, in theory, could be construed as a vague request for an equitable adjustment. However, the excess inventory resulted from Sea Link's careless ordering and was not the fault of Osram.

■ Hence, even if construed as a request for an equitable adjustment, Osram was under no contractual obligation to purchase jack screws that it did not order or to grant *any* equitable adjustment requested. Therefore, the Court finds that even if McFarland's letter is interpreted as a request for an equitable adjustment, Osram exercised its right not to grant an equitable adjustment under the contract.[7]

---

7. McFarland points out in his letter that Osram's last purchase order contract requested a "release quantity" of 578,100 jack screws for delivery in June, 1995. (*Id.* Ex T.) The letter states that, as of February, 1 995, Sea Link had 475,000 jack screws in its warehouse, had another 100,000 ready for shipment, and had another 100,000 ready for plating. (*id.*) McFarland's letter also indicates that Sea Link maintained a 16 week "backup" inventory of jack screws. Thus, even assuming that Osram ordered 578,000 jack screws, Sea Link had 675,000 jack screws on order, plus another 16 weeks worth of backup inventory available. McFarland's own letter—even if considered a request for an equitable adjustment—indicates that Sea Link maintained a practice of over–ordering jack screws.

Additionally, the contract between the parties only required two months—not 16 weeks—worth of backup inventory. McFarland's letter, therefore, supports Osram's contention that Sea Link simply failed to pay attention to the unambiguous contractual language.

### III. *Custom Brackets*

In November, 1991, Osram contracted with Sea Link to tool and manufacture a limited number of sample, custom brackets for its assembly operations. Osram needed the custom brackets to assemble headlights, which then would be shipped to Ford Motor Company ("Ford"). Osram originally intended to purchase screws (*not* the jack screws mentioned *supra*) from Camcar and then assemble Sea Link's custom brackets with Camcar's screws prior to shipping the headlight assembly to Ford. Osram, however, determined that it would be more cost–effective to allow Camcar to purchase the custom brackets from Sea Link, assemble the custom brackets and screws, and ship the assembled bracket–screw piece to Osram, which would assemble the headlights to ship to Ford. Accordingly, Osram contracted directly with Camcar to assemble the screws and custom brackets. Camcar, in turn, contracted with Sea Link to purchase the custom brackets.

In other words, two sets of contracts were involved. A contract existed between Camcar and Sea Link to purchase the custom brackets. A second contract existed between Camcar and Osram for the purchase of the custom bracket–screw assembly.

The contractual relationship in this consumer "food chain" becomes important. In the theoretical marketplace contemplated among these corporate carnivores, the sequence of events would unfold as follows: first, Ford would inform Osram of its forecasted need for headlight assemblies; second, Osram would issue a release schedule to Camcar indicating its need for custom bracket–screw assemblies; third, Camcar would issue a release schedule to Sea Link indicating Camcar's need for custom brackets; and, finally, Sea Link would produce the custom brackets to Camcar for eventual assembly—or consumption—back up the line.

In its Amended Complaint, Sea Link also asserts a claim for the economic losses it claims to have suffered as a result of maintaining excess inventory of the custom brackets ordered by Camcar. Sea Link alleges that in June, 1995, Osram confirmed in writing that the quantities of custom brackets ordered by Camcar would be used in Osram's operations, (Am.Compl.¶ 24.), and gave similar verbal assurances thereafter. Sea Link further contends that Osram is required to purchase the excess inventories of custom brackets currently stored by Sea Link, as a result of *Camcar's* refusal to purchase the number of brackets ordered.

In its Answer to Sea Link's Amended Complaint, Osram asserts a number of defenses, including that Osram was not a party to the contract between Sea Link and Camcar, and that Osram has complied fully with its obligations under any and all contracts with both Sea Link and Camcar. (*See generally* Def.'s Answer to Pl.'s Am. Compl., Second, Third, and Fourth Defenses.)

Osram correctly states that any breach of contract occurred, if at all, between Sea Link and Camcar, as there was no continuing contract between Osram and Sea Link for custom brackets.[8] In an attempt to place liability for its excess inventory on Osram instead of Camcar, Sea Link contends that "Camcar was merely acting as an agent for [Osram] when dealing with or placing orders from [Sea Link]." (Pl.'s Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14 (citing Ga.Code Ann. § 10–6–1).)

■ Pursuant to Georgia law, an agency relationship "arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." Ga.Code Ann. § 10–6–1 (Michie 1994). Sea Link contends that Camcar is Osram's agent by implication. (Pl.'s Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. at 15.) However, for an agency by implication to arise, "[t]he fact of [the] agency may be established by proof of

---

8. There was an initial "tooling" contract between Osram and Sea Link for a limited quantity of custom brackets. (Pl.'s Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4.) The limited quantity of custom brackets was to be quality tested by Osram in order to determine whether to purchase those brackets from Sea Link. In other words, the initial contract simply provided for a "test batch" of custom brackets. However, once Osram determined that it would purchase the entire assembly from Camcar, it did not contract with Sea Link for any more custom brackets.

circumstances, apparent relations, and the conduct of the parties." *Greenbaum v. Brooks* 110 Ga.App. 661, 139 S.E.2d 432, 434 (1964). The test to be applied is whether the principal has "the right to control the time and manner of executing the work, as distinguished from the right merely to require results in conformity to the contracts." *Id.* (discussing agency by implication in the employment context).

■ In support of its contention that Camcar served as Osram's agent, Sea Link produces several documents purporting to establish the agency relationship. First, Sea Link identifies a letter from Camcar to Osram written by Dave Mosnot, a Sales Representative for Camcar. *See* Letter from Dave Mosnot, Camcar, to Michael Murphy ("Murphy"), Osram (Mar. 24, 1994). However, that letter simply requests that Osram "certify" the component parts produced by Sea Link. In other words, Camcar did not want to use Sea Link's custom brackets if Osram had not approved the quality of those component parts. That letter simply sought "assurances" from Osram and in no way gave Osram the right to control the time or manner of Camcar's work. That letter fails to establish an agency relationship—directly or by implication.

■ Second, Sea Link points to a memorandum written by Murphy to representatives of both Camcar and Sea Link in which Murphy explains his understanding of the procedures to be used between the contracting parties. *See* Memorandum from Murphy to Jim McFarland, Sea Link, and Dave Mosnot, Camcar (April 13, 1994). Similarly, that memorandum fails to establish an agency relationship between Camcar and Osram. In that memorandum, Murphy authorizes Sea Link to maintain two months of inventory as "backup." (*Id.*) Murphy also states that "any excess inventory above and beyond a normal [two] month safety stock must be authorized by . . . " Osram. (*Id.*) The letter also explains the procedure that Camcar and Sea Link should use to rotate inventory, the manner in which Camcar will place orders with Sea Link, and the manner in which Sea Link should use its inventory backup. (*Id.*)

Murphy's memorandum fails to establish an agency relationship between Osram and Camcar. The memorandum does not assume liability for the quantity of Camcar's orders, for the quality of the products produced, or for payment of any excess inventory. Through that memorandum, Osram is acting neither as a principal, nor as a surety. Furthermore, the memorandum references both Camcar and Sea Link, and was addressed to representatives of both companies. Thus, if the Court were to construe the memorandum as establishing an agency relationship between Camcar and Osram, the Court also should construe the memorandum as establishing an agency relationship between Sea Link and Osram. In sum, this second piece of documentary evidence fails to establish an agency relationship between Osram and Camcar.

Finally, Sea Link contends that a memorandum that it sent to Osram evidences the agency relationship between Camcar and Osram. *See* Memorandum from Jim McFarland, Sea Link, to Shannon Rehm, Purchasing Manager, Osram (June 8, 1994). However, that memorandum simply sought Osram's assurances that Sea Link was maintaining the appropriate number of custom brackets in backup inventory. *Id.* A handwritten response on the bottom of the memorandum grants assurance from Osram to Sea Link that the latter was, in fact, maintaining appropriate levels of backup inventory for each type of custom bracket. *Id.*

The contention that this memorandum establishes an agency relationship, by implication or otherwise, is perhaps Sea Link's most misplaced argument and rests upon ill-founded logic. In seeking assurances from Osram concerning backup inventories, Sea Link cannot establish or even "evidence" an agency relationship between two separate, independent companies.

For the foregoing reasons, the Court finds that there was no agency relationship between Camcar and Osram. At best, Osram was an intended beneficiary of the contract between Camcar and Sea Link with the theoretical right to require results in conformity to the contract. Since there was no continuing contract for the production of custom

brackets executed between Osram and Sea Link, Osram cannot be held liable for any economic losses suffered by Sea Link as a result of its contract with Camcar. Accordingly, Osram's motion for summary judgment regarding Sea Link's breach of contract claim with respect to the custom brackets will be granted.

### CONCLUSION

The Court carefully has considered Osram's arguments and evidence presented in support of its motion for summary judgment. For all of the foregoing reasons, Osram's motion is **GRANTED.**