**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN H. ADAMS, JR.,
Plaintiff-Appellant,

v.

GREENBRIER OLDSMOBILE/GMC/
VOLKSWAGEN, INCORPORATED, a
Virginia Corporation,
Defendant-Appellee.

No. 97-1544

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
William T. Prince, Magistrate Judge.
(CA-96-887-2)

Argued: March 5, 1998

Decided: January 28, 1999

Before MICHAEL and MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part, reversed in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jack Elmer Ferrebee, JACK E. FERREBEE, P.C., Vir-
ginia Beach, Virginia, for Appellant. Abram William VanderMeer,
Jr., CLARK & STANT, P.C., Virginia Beach, Virginia, for Appellee.
**ON BRIEF:** Timothy W. Dorsey, CLARK & STANT, P.C., Virginia
Beach, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

John Adams appeals the district courts grant of judgment as a matter of law for Greenbrier Oldsmobile/GMC/Volkswagen, Inc. (Greenbrier or Greenbrier Olds). Adams, who suffers from heart problems that have resulted in a series of heart attacks, claims that Greenbrier Olds fired him because of his heart condition in violation of the Americans with Disabilities Act (ADA), 42 U.S.C.§§ 12101-12213 (1994). In addition, he alleges that Greenbrier Olds breached an oral lifetime employment contract that he had with the company by firing him without cause. We affirm the district court's ruling that Adams failed to present sufficient evidence to support his contract claim. However, because the court erred in directing a verdict on Adams's ADA claim, we reverse in part and remand for a new trial.

I.

This case involves three Chesapeake, Virginia, car dealerships and the employment services of John ("Jack") Adams. Greenbrier Olds, the defendant, and Greenbrier Chrysler/Plymouth/Jeep/Eagle (Greenbrier Chrysler) are separate dealerships that shared common owners and management in late 1994, when both companies attempted to hire Adams away from his job at Greenbrier Dodge, a third, unrelated dealership.

Adams began his employment at Greenbrier Dodge as a car salesman in January 1992. He was later promoted to the position of used car sales manager notwithstanding a serious heart attack shortly after he was hired. This heart attack, Adams's second, required six-way bypass surgery and two months of recuperation away from work. When Adams did return to work, his health required that he stop traveling for business and "cut . . . way back" from the sixty-five-hour weeks that he had worked previously. In spite of these health-related

2

restrictions, Adams retained his job at Greenbrier Dodge and received the promotion. Indeed, his employment with that dealership continued after another round of bypass surgery following his third heart attack in September 1993.

In November 1994 Greenbrier Chrysler began its efforts to hire Adams away from the Dodge dealership. Brad Hunt, Greenbrier Chrysler's vice-president, telephoned Adams to offer him a position as a new car manager at that dealership's Chrysler division after the two men had discussions over lunch. Adams, however, was quite satisfied with his position at Greenbrier Dodge, and he declined the offer. The next day Greenbrier Chrysler's president and 75 percent owner, Bill Shepard, called Adams and convinced him to discuss the matter further.

Adams, Shepard, and Hunt then met to discuss the possibility of Adams becoming the used (rather than new) car sales manager for Greenbrier Chrysler. After speaking generally about Greenbrier Chrysler and how long it retains its employees, Shepard and Hunt offered Adams a position in the company with a salary that nearly doubled his earnings at the Dodge dealership. When questioned at trial about this offer, Adams testified that "first and foremost in my mind . . ., it was a lifetime commitment, . . . it was a job for life. It would be the last job I ever had." He also testified that Shepard and Hunt promised to provide health insurance to guarantee that his pre-existing heart condition would be insured after he changed jobs. Similarly, they agreed that Adams's health would not allow him to work seventy-hour weeks and that he could not take a lot of pressure at work. They emphasized that the "main thing" they were interested in was Adams's "super reputation" and his twenty-four years of experience in the industry. Adams called Hunt back a few days later to accept the job.

Adams reconsidered his acceptance, however, after a routine physical examination. When he told his doctor about the new job and his expected salary, the doctor responded, "you'll be the richest guy in the cemetery," adding, "you think anyone's going to pay you that much money without a ton of crap?" After considering this warning, Adams met with Hunt to withdraw his acceptance. Adams explained that selling 400 used cars a month in the Chrysler store involved

3

much more pressure than his job at the Dodge store and that his doctor had convinced him not to accept the job due to his health. Moreover, Adams expressed concern that the Chrysler dealership might "throw [him] out" if his health declined to the point that he could not work.

Shepard and Hunt then turned their focus towards hiring Adams for Greenbrier Olds instead of the larger Chrysler store. As the general manager of the Olds dealership (and vice-president of both companies), Hunt asked Steven Deneroff, an old friend of Adams and a sales manager at the Olds store, to recruit Adams to the Olds store. Shepard, Greenbrier Oldsmobile's president and majority owner, also told Deneroff that he "should do anything [he could] to get" Adams on board. Accordingly, Deneroff telephoned Adams in mid-January 1995 to ask him if he would be interested in working for Greenbrier Olds. Initially, Adams was not interested in further employment discussions, but he agreed to reopen the discussions after Deneroff explained first that the Olds store was much smaller and would involve considerably less pressure than the Chrysler store, and second that Hunt could address Adams's concerns about his health and job security.

On Friday, January 20, 1995, Adams met with Hunt and Deneroff to discuss employment with the Oldsmobile dealership. Again, Hunt agreed to provide Adams insurance, to accommodate his health limitations by allowing him time off when he was tired, and to guarantee that he would not have to travel on business. Both Adams and Deneroff testified that Hunt told Adams that "they wanted him there . . . forever." Hunt added that "[w]e want you to become part of the family and stay . . . [as] long as you want." Finally, Hunt and Deneroff addressed Adams's concerns about his health and job security by telling Adams about Brook Mears. Mears had been an employee who contracted lung cancer after working about seventeen years for the company. Despite Mears' inability to work, the company paid his full salary when he was in the hospital and even paid his wife for several months after his death. Adams was told, "Jack, that's the way we'll treat you, identical to that." After considering this offer over a weekend, Adams accepted the position as a new car sales manager and began work at Greenbrier Olds on January 25, 1995.

4

The new car department at Greenbrier Olds was divided into three desks, each separately responsible for selling Oldsmobiles, GMCs, and Volkswagens. Adams started at Greenbrier as the GMC new car sales manager in late January and served in that position about two months, or until April 1, 1995. During this period he performed his job well and attended work regularly. Indeed, Hunt told Adams that he was "extremely happy" with his performance, and Hunt told Deneroff that he was "really happy" with Adams's work. During this period Hunt never personally criticized Adams's performance. Quite the contrary, Hunt was "extremely pleased" with the GMC sales figures.

Hunt nevertheless decided to move Adams to the used car sales desk in late March because of two problems he had been having with the used car sales manager, Avi Levy. First, Hunt believed that Levy might be taking kickbacks by selling cars to other dealers for reduced prices and splitting the difference with the dealer-buyers. Additionally, the new car managers had complained that Levy was providing low appraisals on potential trade-ins. As a result of these low appraisals, new car sales were lost when customers shopped around and obtained better trade-in values at other dealerships. Because of Adams's used car experience, Hunt moved him over to share the used car desk with Levy, asking Adams to look into these problems and "keep an eye on" Levy.

From April 1 to about July 1, 1995, Adams worked the used car sales desk with Levy by alternating shifts. Although Adams did not find evidence of kickbacks, he eliminated any potential problem by ending the resale of used cars to other dealers. Similarly, Deneroff testified that appraisals improved with Adams's presence and that he was able to make "a few extra" new car sales as a result. Adams also showed initiative in his position. In early April Hunt asked Adams if there was anything he could do to increase sales. Adams first recommended that Greenbrier take the low-end (under $4,000) used cars obtained from trade-ins and sell them retail to customers with marginal credit instead of wholesaling them at auction. After Adams demonstrated that these cars could be sold with a sufficient profit, Hunt gave Adams the "green light" to open Greenbrier's budget center. Adams's second recommendation involved starting a finance center that would enable customers with marginal credit to buy these

5

low-end vehicles and thus boost sales. Hunt pursued this option by attempting to recruit Steven Jaranto to do the financing work. In discussing the position, Hunt told Jaranto that he should talk to Adams about the company because the company had recruited Adams from a competitor and he now had "a lifetime position with" Greenbrier Olds. Hunt's discussions with Jaranto broke off, however, when the principal owner, Shepard, decided to hire Jaranto for the Chrysler store. Perhaps because Jaranto was not placed at the Olds store, Adams was not able to open the budget center by the time he was fired in July.

Adams testified that during his time at the used car desk, Hunt did not criticize his performance. Although Deneroff testified that Hunt expressed disappointment in July that the overall level of used car sales did not increase after Adams's transfer (in April) to used cars, Deneroff acknowledged that volume is only one factor affecting profitability. Although Adams sold only a few more used cars than Levy, Adams was able to make more profit out of each sale. Moreover, Deneroff believed that sales did not increase because Adams and Levy were not getting along. From the start, Levy resented Adams's presence at the used car desk, refusing to speak or work with him. This circumstance was not surprising, however, as other employees had conflicts with Levy from time to time.

Around July 1, 1995, Hunt again changed Adams's duties so that his time was divided between new and used cars. This change was prompted because Deneroff had been working long hours, manning both the Olds and GMC new car sales desks by himself. To give Deneroff as well as Levy days off, Adams split his time filling in for the two of them. Again, Adams testified that Hunt did not criticize him for his performance after the July job adjustment.

In mid-July, however, Hunt discussed Adams's status with Deneroff over lunch. He stated that Adams had not done what he had expected him to do in the used car department. Although Adams had been moved back to the new car desk half time, Hunt"was really afraid of putting any pressure on [Adams be]cause of his health" and, consequently, he "didn't feel that [Adams] could do what he expected him to do." Hunt then asked Deneroff for suggestions and Deneroff gave three solutions: (1) transfer Adams to another store or another

6

position, (2) give Adams a position in the used car finance center, or (3) fire him. Hunt stated that the first option was "definitely out of the question" because it "wouldn't change . . . their feelings or their liability about him." In other words, "his health could not handle [it]." When Hunt asked Deneroff if he had any objection to putting Adams back at the new car desk full time, Deneroff told him that he needed the Olds and GMC desks for himself. No other transfers were pursued and the second option was not discussed.

On July 19, 1995, Adams entered Hunt's office to ask about possible vacation time but the issue was never discussed. Instead, Hunt told him that "we have to part company." He added that Adams was being fired because both Hunt and Shepard "felt that [his] health wasn't up to the job" and that the decision "wasn't up for discussion." No specific reasons were given, and Hunt told Adams to report to the personnel director. Shocked, Adams left and proceeded to complete his exit paperwork. One entry asked the reason for leaving work, and Adams said that he did not know what to write down. The personnel director asked, "why did [Hunt] fire you?" Adams responded that "he told me my health wasn't up to the job," so she said "write that in there." Adams wrote "health," signed the form, and left.

Adams then brought this suit against Greenbrier Olds alleging, among other things, violations of the ADA and breach of contract. After Adams had presented his case-in-chief, but before Greenbrier had presented its case, the district court granted Greenbrier a directed verdict from the bench. Adams appeals.

II.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability . . . in regard to . . . [the] discharge of employees." See 42 U.S.C. § 12112(a). Consequently, in order to establish a case of discriminatory discharge, the plaintiff must prove that (1) he has a "disability," (2) he is a "qualified individual," and (3) his discharge was a result of discrimination "because of the disability." See id.; Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997); Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 212 (4th Cir. 1994). The district court ruled that Adams sufficiently established the first two fac-

tors, and these rulings are not before us on appeal. **1** We therefore need only address whether a reasonable jury could find that Greenbrier discriminated against Adams because of his disability. We hold that it could.

A.

An ADA plaintiff may either prove his case with direct or circumstantial evidence, or he may rely on the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 303 (4th Cir. 1998); see also Ennis v. National Ass'n of Bus. & Educ. Radio, 53 F.3d 55, 57-59 (4th Cir. 1995) (applying McDonnell Douglas prima facie case analysis to ADA cases). Unless a plaintiff can provide sufficient direct or circumstantial evidence to raise a genuine issue of material fact as to intentional discrimination, he must use the McDonnell Douglas proof scheme to prove his case. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). The district court analyzed this case under the normal standard of proof scheme, while the parties' briefs to us focus on the McDonnell Douglas framework. This difference need not delay us, however, because once the case is tried on the merits, we look only to the ultimate question of whether the plaintiff sufficiently proved that intentional discrimination occurred. See Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995). Where, as here, the trial proceeded through the plaintiff's case-in-chief, we simply analyze the case as if the defense rested without presenting any evidence. Accordingly, we must determine if a reasonable jury could conclude from all the evidence that Adams's termination was the result of discrimination on the basis of his disability.

---

**1** Although Greenbrier says in a brief footnote in its brief that the district court erred in ruling that Adams had sufficiently established his disability under the Act, Greenbrier abandoned this contention by failing to develop it on appeal. See 11126 Baltimore Blvd., Inc. v. Prince George's County, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc); see also Fed. R. App. P. 28(a)(6), (b). Further, we decline to exercise our discretion to reach the issue here. Cf. Curry v. Beatrice Pocahontas Coal Co., 67 F.3d 517, 522 (4th Cir. 1995) (holding that this "rule[of avoiding issues not raised] is not an absolute one and review may proceed [sua sponte] when the equities require").

B.

The district court concluded that a reasonable jury could not find for Adams because the court believed that the strong inference of nondiscrimination recognized by this court in Proud v. Stone, 945 F.2d 796 (4th Cir. 1991), applied to this case. The district court ruled that when Adams's evidence of discrimination was viewed in light of the Proud inference, Adams's case could not go to a jury. We hold that the court erred in so ruling.

In Proud, an age discrimination case, we recognized a "strong inference . . . that discrimination was not a determining factor" in a discharge decision when (1) the person who hired the plaintiff knew of the plaintiff's protected condition when the hiring decision was made, (2) the person who hired the plaintiff also fires him (3) within a "relatively short time span following the hiring," and (4) the employer advances a legitimate and nondiscriminatory reason for the discharge. See id. at 796, 797-98. We reasoned that "`[i]t hardly makes sense [for an employer] to hire workers from a group [it] dislikes . . ., only to fire them once they are on the job." Id. at 797. If discrimination actually motivated the adverse employment action, the same discrimination most likely would have also affected the employer's original decision to hire the plaintiff. However, because the employer did in fact hire the plaintiff, it is unlikely that discrimination existed either when the plaintiff was hired or shortly thereafter when he was fired. The existence of a legitimate, nondiscriminatory reason for the later decision (the firing) thus creates a compelling inference that this decision was not motivated by discrimination. See id. at 798 (Proud's "strong inference [is] that the employer's stated reason for acting against the employee is not pretextual").

Since Proud we have extended the "same actor inference" from its original context of age discrimination to other forms of discrimination, including discrimination on the basis of an ADA-protected disability. See Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 214-15 (4th Cir. 1994) (ADA disability discrimination); see also, e.g., DeJarnette v. Corning Inc., 133 F.3d 293, 298 (4th Cir. 1998) (Pregnancy Discrimination Act); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996) (Title VII gender discrimination); Amirmokri v. Baltimore Gas & Elec. Co. , 60 F.3d 1126, 1130

9

(4th Cir. 1995) (Title VII national origin discrimination); Mitchell v. Data General Corp., 12 F.3d 1310, 1318 (4th Cir. 1993) (Age Discrimination in Employment Act).

The Proud inference, however, loses its force when the plaintiff presents sufficiently compelling evidence of discrimination. See, e.g., Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir. 1994); Proud, 945 F.2d at 798. Indeed, the presumption is rebutted when the reason the employer gives for the adverse action is discriminatory on its face. Cf. Madel v. FCI Marketing, Inc., 116 F.3d 1247, 1253 (8th Cir. 1997) (Proud inference as applied in Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 174-75 (8th Cir. 1992), does not apply when plaintiff presents evidence of overt discrimination in form of derogatory comments about age). In this case Hunt told Adams that he was being terminated because his "health wasn't up for the job." This direct evidence would allow a jury to conclude that the reason provided by Hunt was the true reason for Adams's termination without having to infer from other facts that discrimination motivated the firing. Unlike most statements seen in disability cases, Hunt's words do much more than simply refer to Adams's disability in a negative light. They specifically identify Adams's disability as the reason for the challenged termination. In these circumstances, the Proud inference drops out of the case. In short, the district court should have allowed the jury to weigh the credibility of the witnesses and assess the evidence as a whole to determine if discrimination motivated Adams's termination.

Had the court sent the case to the jury, it is clear that the evidence presented was sufficient to allow a reasonable jury to find that Hunt fired Adams because of his heart condition.

Most damning is Adams's testimony that Hunt fired him by explaining that they would "have to part company" because both Hunt and Shepard "felt that [Adams's] health wasn't up to the job." This statement is tantamount to an admission that the reason that Adams was fired was because of his disability.

Moreover, this testimony does not stand alone. It is supported both by documentary evidence and by the testimony of Deneroff. When Adams went to Greenbrier's personnel director to complete paper-

10

work immediately after being terminated, he testified that he asked what he should write down as the reason for his termination. After he told the director what Hunt said to him, he was instructed to write that on the form, and he wrote "health." This exit interview form was admitted into evidence.

Deneroff's testimony also supports Adams's case. He testified that in the week prior to Adams's termination, Hunt told him that although Adams did not do what he expected him to do in the used car department, he was "really afraid of putting pressure on [Adams be]cause of his health." In response to Hunt's request for suggestions, Deneroff gave Hunt several ways to address Hunt's concerns short of termination. Deneroff testified that Hunt said the option of moving Adams to another dealership was "[d]efinitely out of the question" because it "wouldn't change . . . their feelings or their liability about him" and "his health could not handle that." Deneroff further explained that "liability" referred to liability for Adams's health. A jury could reasonably take these statements as reflecting Hunt's view that Adams's health would not enable him to perform in these positions. Although Deneroff told Hunt that he did not want to share more of his own work with Adams, the general option of transferring Adams to a different position in the same dealership was not discussed. Hunt similarly ignored Deneroff's suggestion that Adams be moved into a new position in Greenbrier's used car finance department.

Taken together, this evidence would allow a reasonable jury to conclude that Adams was fired because of his disability. The evidence suggests that Adams's job performance at Greenbrier was good and that he had no disciplinary problems. Even assuming that Hunt wanted a better performance out of Adams, Deneroff's testimony suggests that Hunt's fear of pressuring Adams because of his health led to Adams's termination. A jury could also conclude that Hunt's failure to consider Deneroff's other suggestions reflected that Hunt had made up his mind that Adams's employment could not continue because his disability prevented him from doing what was expected of him.

Accordingly, we hold that the district court erred in granting a directed verdict for Greenbrier on Adams's ADA claim.

III.

In addition to his federal ADA claim, Adams argues that the district court erred in granting Greenbrier a directed verdict on his state law contract claim. The district court ruled that Adams's alleged oral lifetime employment contract was unenforceable because it fell within Virginia's statute of frauds, Va. Code Ann. § 11-2(8) (Michie 1993). Alternatively, the court held that the evidence was too vague and indefinite to prove a lifetime employment contract under Virginia law. While Adams is correct that the statute of frauds does not bar his claim, we agree with the district court that the evidence presented at trial is insufficient to prove the contract.

A.

Virginia's statute of frauds provides that an oral contract "that is not to be performed within a year" is generally unenforceable. See Va. Code Ann. § 11-2(8); Murphy v. Nolte & Co. , 307 S.E.2d 242, 245 (Va. 1983). However, when a contract "by its terms, or by reasonable construction, . . . can be fully performed on one side within a year," "the contract is not within the statute [of frauds] and need not be in writing." Silverman v. Bernot, 239 S.E.2d 118, 121 (Va. 1977). This is true even though the possibility of performance under the contract's own terms is due solely to the "occurrence of some improbable event, [such] as the death of the person referred to[in the agreement]." Id.; see also Falls v. Virginia State Bar, 397 S.E.2d 671, 672-73 (Va. 1990) (contract is enforceable if it "expressly provide[s] that the occurrence of [such an event] would constitute full performance"). So long as a contract specifies that it will stay in force for the lifetime of an individual, the contract falls outside the statute of frauds. In such cases, performance (employment services for the employee's life) will be complete upon the employee's death. Because the employee may die at any time, full performance is possible within one year and the statute of frauds is inapplicable. **2**

_____

**2** The fact that a party to an oral contract may die within one year is insufficient by itself to save the agreement in the absence of a contractual term measuring the duration of the contract by the party's life. See Falls, 397 S.E.2d at 673. Even though the contract will necessarily terminate by operation of law upon the party's death, termination by operation of law is not "performance" within the meaning of the statute of frauds. See id. at 672-73; Graham v. Central Fidelity Bank, 428 S.E.2d 916, 918 (Va. 1993).

12

In this case, Adams maintains that he had an oral employment contract with Greenbrier lasting for his lifetime and that he has presented evidence to support this claim. Because such a contract is not barred by the statute of frauds, we agree with Adams that the district court erred in relying on the statute in granting Greenbrier a directed verdict on his contract claim.**3**

B.

Although Adams clears the first hurdle to his lifetime employment claim, the evidence presented at trial cannot get him over the second. Because we agree with the district court that Adams's evidence is insufficient to establish a lifetime employment contract under Virginia law, we affirm the directed verdict on the breach of contract claim.

In Virginia, "where no specific time is fixed for the duration of the employment, there is a rebuttable presumption that the hiring is terminable at will." Miller v. Sevamp, Inc., 362 S.E.2d 915, 917 (Va. 1987); see also Progress Printing Co. v. Nichols , 421 S.E.2d 428, 429 & n.1 (Va. 1992) (at-will presumption is that "the employment term extends for an indefinite period and may be terminated for any reason upon reasonable notice" subject only to narrow public policy exceptions). Because a lifetime employment contract, like a contract terminable only for cause, sets a definite term for the duration of the employment (that is, the life of the worker), it will rebut the at-will presumption. Cf. Progress Printing, 421 S.E.2d at 430 (contract terminable by cause rebuts presumption). The question, then, is whether Adams's evidence of a lifetime employment contract is sufficient to reach a jury.

Adams fails to cite to a single Virginia case involving a lifetime employment contract, and our independent review of Virginia law has found only one such opinion. See Harvey v. Richmond, Fredericksburg & Potomac Ry., 173 S.E. 351, 353 (Va. 1934) (affirming exclusion of testimony on oral lifetime employment contract on ground that

_____

**3** Because we conclude that the statute of frauds does not apply to Adams's claim, we need not address Adams's argument that Greenbrier is equitably estopped from asserting the statute as an affirmative defense.

13

employee could not establish that he provided any consideration for this contract in addition to his provision of services). Because the Harvey decision does not discuss the quantum of evidence necessary to establish an employment contract for life, however, it appears that the Virginia courts have not yet spoken on the question before us. Even without direct guidance, we must attempt to"ascertain from all the available data what the state law is." West v. AT&T, 311 U.S. 223, 237 (1940); see also Orchard Group, Inc. v. Konica Med. Corp., 135 F.3d 421, 427 (6th Cir. 1998) (federal courts may look to sources including restatements of law, law reviews, and majority rules among other states); Packard v. Provident Nat'l Bank , 994 F.2d 1039, 1049 (3d Cir. 1993) (courts may look to majority rule from other states); Helene Curtis Indus., Inc. v. Pruitt, 385 F.2d 841, 848 (5th Cir. 1967) (similar to Orchard Group); Glassman Const. Co. v. Fidelity & Cas. Co., 356 F.2d 340, 342 n.7 (D.C. Cir. 1966) (same).

The Supreme Court of Virginia has generally stated that "[w]here the evidence concerning the terms of a contract is in conflict, the question [of] whether the contract is at will or for a definite term becomes one of fact for resolution by a jury." Miller, 362 S.E.2d at 917. However, if a jury could not reasonably conclude that the employment was for a definite term, the suit may be dismissed. See id. at 918. A lifetime contract cannot be found here because we believe that the Virginia Supreme Court would require a plaintiff to make a heightened showing in proving the existence of an employment contract for life. Cf. Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994) (in absence of state law on point, federal court "attempts to do as the state court would do if confronted with the same fact pattern").

Commentators state that most jurisdictions require that a contract of permanent or lifetime employment must be clearly, specifically, and unequivocally expressed. See 30 C.J.S. Employer-Employee Relationship § 23, at 43 (1992); 9 Williston on Contracts § 1017, at 132 (1967); James J. O'Malley, Cause of Action for Wrongful Discharge from Employment in Breach of Contract§ 9, in 18 Causes of Action 229, 280 (1989); see also, e.g., Wright v. Dothan Chrysler Plymouth Dodge, Inc., 658 So.2d 428, 430 (Ala. 1995) ("clear and unequivocal" offer needed with additional consideration for contract); Shebar v. Sanyo Bus. Sys. Corp., 544 A.2d 377, 381, 382 (N.J. 1988) (contract terms must be "`clearly and unequivocally expressed'");

14

Williamson v. Sharvest Management Co., 415 S.E.2d 271, 274 (W.Va. 1992) (offer must be in "clear and unequivocal terms"). Because of the extraordinary nature of lifetime employment contracts, we believe Virginia would adopt the majority view and require such a showing.

Although Adams indicated that he was told that his job was a "job for life," we believe this is insufficient in the context of his entire testimony. All of Adams's testimony regarding the duration of his contract is qualified by statements such as "I felt that . . . it [would] be forever" and "in my mind . . . it was a job for life." Because such testimony expresses Adams's subjective opinion rather than objective statements that are attributable to Greenbrier, it falls short of the clear and unequivocal evidence needed to establish lifetime employment. Besides his own testimony, Adams heavily relies on Deneroff's testimony that Hunt told Adams that he wanted Adams there forever and that Adams could stay as long as he wanted. However, Deneroff explained on cross-examination that Hunt told him the same thing when he was recruited and that Greenbrier "has the reputation of retaining its sales managers if they perform." Consequently, Hunt's statements are best viewed as expressions of a general expectation and not of an intent to create a lifetime contract. Finally, Adams admits that he has never heard of another lifetime employment contract in his twenty-four years in the industry. Taken as a whole, the evidence does not demonstrate a clear, definite, and unequivocal intent to create a lifetime employment contract, even when viewed in the best light for Adams. We therefore affirm the district court's grant of a directed verdict to Greenbrier on Adams's contract claim.

IV.

For the reasons above, we conclude that the district court correctly granted Greenbrier's motion for judgment as a matter of law on Adams's claim of breach of contract. However, because judgment as a matter of law was inappropriate for Adams's ADA claim, we reverse and remand for a new trial on that claim.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

15